1   FRANCIS M. GREGOREK (144785)
    gregorek@whafh.com
2   BETSY C. MANIFOLD (182450)
    manifold@whafh.com
3   RACHELE R. RICKERT (190634)
    rickert@whafh.com
4   MARISA C. LIVESAY (223247)
    livesay@whafh.com
5   WOLF HALDENSTEIN ADLER
      FREEMAN & HERZ LLP
6   750 B Street, Suite 2770
    San Diego, CA 92101
7   Telephone: 619/239-4599
    Facsimile:  619/234-4599
8

9   JACOB H. ZAMANSKY
    jake@zamansky.com
10  EDWARD H. GLENN JR.
    KEVIN D. GALBRAITH
11  ZAMANSKY & ASSOCIATES LLC
    50 Broadway, 32nd Floor
12  New York, NY 10004
    Telephone: 212/742-1414
13  Facsimile:  212/545-1177

14
    Attorneys for Plaintiff
15  [Additional Counsel on Signature Page]

16                  UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
17                       SAN JOSE BRANCH

18  MIKE LAFFEN, an Individual, On Behalf of    )   CASE NO. CV12-06199
    Himself and All Others Similarly Situated,  )
19                                              )
                                                )   CLASS ACTION COMPLAINT FOR
20                Plaintiff,                     )   VIOLATIONS OF THE EMPLOYEE
                                                )   RETIREMENT INCOME SECURITY
21  vs.                                         )   ACT, 29 U.S.C. § 1132
                                                )
22  HEWLETT-PACKARD COMPANY, PLAN               )
    COMMITTEE, INVESTMENT REVIEW                )   CLASS ACTION
23  COMMITTEE, and JOHN DOE                     )
    "FIDUCIARIES" 1-50,                         )
24                                              )   DEMAND FOR JURY TRIAL
                  Defendants,                   )
25  and                                         )
                                                )
26  HEWLETT-PACKARD COMPANY 401(K)              )
    PLAN,                                       )
27                                              )
                  Nominal Defendant.            )
28  _____     )

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

Plaintiff, Mike Laffen, an individual, on behalf of himself and on behalf of the class of other similarly situated participants in and beneficiaries of Hewlett-Packard Company's ("HP" or the "Company") 401(k) Plan (the "Plan"), by their attorneys, alleges the following based upon the investigation of counsel, which included a review of documents obtained from the Company governing the operations of the Plan; a review of Internal Revenue Service Form 5500s ("Form 5500s") filed by the Plan with the United States Department of Labor ("DOL"); discussions with Plan participants; filings by HP with the United States Securities and Exchange Commission ("SEC"); press releases and other public statements issued by the Company, documents filed in other legal actions, and media reports. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

1.      This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132 against the Defendants, fiduciaries of the Plan.

2.      The Plan is sponsored by HP for eligible employees and is a defined contribution plan. This class action is brought on behalf participants in the Plan whose individual accounts transacted in and/or held HP common stock at any time between February 12, 2011, through November 22, 2012 (the "Class Period").

3.      The basis of the action is that the Plan's fiduciaries were aware or should have been aware of internal and external warnings indicating HP had engaged in a series of strategic management blunders wasting nearly $20 billion which has destroyed HP's market position and credibility, and brought it to the verge of collapse causing its stock price to fall approximately 76 percent. Currently, HP has an Altman Z-score[1] of .999, or below 1, which means that there is a high probability of distress and that the odds of bankruptcy within the next two years is greater than 50 percent. HP has been felled by: (1) grossly overpaying for acquisitions of Electronic Data Services Inc. ("EDS") and Autonomy Corporation PLC ("Autonomy"), causing write-offs of $16.8 billion; (2) acquiring Palm Inc. ("Palm") for $1.2 billion and announcing it was "all in" on a

---

[1]      An Altman Z-score is a calculation based on several financial ratios and generally used as a predictor of bankruptcy.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

1  new core business strategy towards webOS-based tablets and integrated products, then abruptly

2  abandoning the new strategy; and (3) CEO turnover.

3      4.    By ignoring these internal and external warnings, the Plan fiduciaries breached

4  their duties of prudence and loyalty to the Plan participants under ERISA § 404(a), 29 U.S.C. §

5  1104(a), with regard to the heavy concentration and continued investment in HP common stock

6  held under the Plan.  The Plan did not prohibit the fiduciaries from placing restrictions or other

7  limitations on the offering of HP stock in the event it became imprudent, and the Plan fiduciaries

8  had already limited the maximum amount of HP stock that Plan participants could hold.  As a

9  result, the Plan's continued offering of HP stock, and doing so on an unrestricted basis, was an

10  exercise of discretion.

11      5.    Due to HP's repeated costly management blunders, it was imprudent for any

12  fiduciary, under any circumstances, to subject, or continue to subject, the Plan's assets to such

13  risks.  HP's management failures imperiled and jeopardized the Company along with its financial

14  and strategic position for years to come.  [As further explained below, Defendants were well-

15  aware that HP  had suffered critical, if not mortal, self-inflicted wounds that would cost it billions

16  and billions of dollars in losses, reputational damage, regulatory costs, and long-reaching harm to

17  its financial condition going forward, that was  imminent and would seriously damage the price of

18  company stock.]

19      6.    Count I alleges that the Plan fiduciaries breached their duties and failed to manage

20  and administer the Plan assets with the care, skill, prudence, and diligence of a prudent person

21  under the circumstances by:  (i) continuing to offer HP stock without restrictions after it was

22  imprudent to do so; (ii) failing to provide complete and accurate information to Plan participants

23  about the risk and prudence of  investing for retirement in HP stock; and (iii) permitting

24  transactions by the Plan in HP common stock at artificially inflated prices.   These

25  actions/inactions run directly counter to the express purpose of ERISA pension plans, which are

26  designated to help provide funds for participants' retirement. *See* ERISA § 2, 29 U.S.C. § 1001

27  (2012) ("Congressional findings and declaration of policy").

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

7.     Count II alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that they knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue to offer HP stock as an investment option without any restrictions and investing Plan assets in HP stock when it was no longer prudent to do so.

8.     Count III alleges that certain Defendants failed to avoid or ameliorate conflicts of interest which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan and the Plan's best interests in mind.

9.     Count IV alleges that certain Defendants breached their duties and responsibilities as co-fiduciaries by knowing of breaches of fiduciary duties and failing to remedy them, knowingly participating in the breaches of fiduciary duties and/or enabling breaches of fiduciary duties.

10.    As discussed more fully below, during the Class Period, Defendants knew or should have known that HP stock had become an imprudent investment.

11.    First, in May 2008, HP acquired EDS for $13.9 billion.  EDS was supposed to be a valuable addition to its enterprise software division.  HP hoped to compete with IBM and Oracle but was far behind in its software build-outs and could not catch up.  HP management overpaid for EDS and seriously misjudged its ability to compete against IBM and Oracle.  In August 2012, long after its profitability had collapsed and after numerous management changes, HP announced a write-off of $8 billion for EDS, wiping out this year's earnings.

12.    Second, in July 2010, HP acquired Palm in a $1.2 billion transaction for the purpose of obtaining webOS, a proprietary mobile operating system.  HP touted this acquisition of webOS as a "game-changing event," that would enable HP to execute on a new core business strategy in the burgeoning smartphone and tablet markets of building and selling a seamless and integrated digital environment or "ecosystem" of devices connected together by webOS.   HP's "TouchPad" tablet was the flagship product that anchored the "ecosystem" and its PCs, printers, tablets and smartphones would all operate on webOS, a universal operating system.  This new core business strategy founded on webOS would make HP competitive in the new, next-generation

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 3 -

mobile device era in the years ahead, which was necessary for it to maintain its leadership position in traditional business lines and products such as PCs and printers also.

13.     In August 2011, HP announced the sudden abandonment of this "game-changing" strategy with webOS. HP's new strategy rapidly failed due to its rush to demonstrate progress that was non-existent. HP over-hyped and misled investors about the state of its development of mobile integrated PC and printer products, failed to dedicate the resources necessary to develop webOS and rushed the "TouchPad" tablet to the market despite numerous software flaws. Then, HP shocked the marketplace when it announced that it was dropping the webOS strategy that was supposed to be its foundation for years to come, and just gave away webOS to the public (rather than attempting to sell it and redeem some value). HP's failure with webOS and the smartphone/tablet market has damaged its competitive position for years to come as the consumer market moves further towards mobile products.

14.     Third, on August 18, 2011, at or about the same time, HP announced it was in discussions to acquire Autonomy, a large British firm, later confirmed at $10.3 billion. HP purchased Autonomy to further compete with rivals such as IBM in the enterprise software market even despite warnings and other "red flags" of possible fraud. This acquisition turned out to be disastrous and HP announced that there were "serious accounting improprieties" and "outright misrepresentations by Autonomy," and took an $8.8 billion accounting charge.

15.     HP's acquisition and business strategy failures represent spectacular management blunders by a company that was floundering to compete in the changing consumer landscape which favors mobile products. As these events unfolded, the Plan fiduciaries knew or should have known of the foreseeable and obvious damage they would wreck on HP's value and stock price, and the HP stock held by the Plan.

16.     By the time of and during the Class Period, HP stock had become an imprudent investment. The Plan fiduciaries should have acted to protect participants from the foreseeable damage they would suffer from transacting in or holding HP stock, after it had become imprudent. A prudent fiduciary would have ceased offering HP stock through the Plan or otherwise restricted transactions in HP stock on a temporary or longer basis to avoid damage to the Plan during the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 4 -

1  Class Period.

2       17.    Defendants breached their fiduciary duties to the Plan participants, including the

3  fiduciary duties of prudence and loyalty set forth in ERISA § 404(a), 29 U.S.C. § 1104(a) by:  (i)

4  failing to manage and administer the Plan assets with the care, skill, prudence, and diligence of a

5  prudent person under the circumstances; (ii) investing Plan assets in HP common stock when HP

6  common stock was an imprudent investment option for retirement savings; (iii) failing to inform

7  Plan participants about the true risk and return characteristics of HP common stock and the

8  suitability of HP common stock as a retirement savings investment; (iv) failing to disclose to Plan

9  participants material information concerning HP and HP common stock, information which was

10  necessary to allow participants to make informed judgments concerning their retirement savings;

11  and (v) permitting the participants to invest their retirement savings in HP common stock (as

12  opposed to the other options under the Plan) when the price of HP common stock was

13  substantially artificially inflated during the Class Period.

14       18.    Defendants are personally liable to the Plan participants for the losses resulting

15  from each breach of fiduciary duty, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).  The Plan

16  fiduciaries, as well as all co-fiduciaries, are liable to the Plan for losses caused by their breaches.

17  In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks appropriate

18  equitable relief including, without limitation, the equitable remedy of surcharge, restitution,

19  monetary relief, and lost profits from alternative prudent investments.

20  **II.    JURISDICTION AND VENUE**

21       19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C §

22  1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

23       20.    Venue is proper in this district pursuant to ERISA § 501(e)(2), 29 U.S.C. §

24  1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches

25  for which relief is sought occurred in this district, and/or some Defendants reside or maintain their

26  primary place of business in this district. HP has operations in this district and division, including

27  its principal executive offices at 3000 Hanover Street, Palo Alto, California 94304.

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 5 -

21.     Additionally, it is likely that many of the parties and potential witnesses, including the Plan's administrative committee members, corporate executives and many plan participants, are located in or within close proximity to this district.

## III.    THE PARTIES

22.     Plaintiff Mike Laffen is a resident of the State of California and is a Plan "participant" within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  He is a former employee of Defendant HP who purchased HP stock through the Plan, and held HP stock during the Class Period.  He suffered losses from holding HP stock rather than diversifying into other investment options under the Plan.

### A.     Nominal Non-Party Defendant

23.     Nominal Defendant Hewlett-Packard Company 401(K) Plan is an employee pension benefit plan under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Specifically, the Plan is a defined contribution plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(34).  The Plan generally includes all active, full and part time salaried, U.S. Dollar–paid employees of HP and certain affiliated companies.

24.     The Plan is a legal entity that can sue and be sued. *See* ERISA §502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party but relief is requested on behalf of, and for the benefit of, the Plan.  Thus, the Plan is a nominal non-party.

### B.     Corporate Defendant

25.     Defendant HP is a Delaware corporation with principal executive offices at 3000 Hanover Street, Palo Alto, California 94304. The Company describes itself as the world's largest information technology company and the leading provider of products, technologies, software, solutions and services to individual consumers, small and medium-sized businesses and large enterprises, including customers in the government, health and education sectors. In particular, HP is the world's leading vendor of personal computers as well as printers and related printing supplies. Throughout the Class Period, HP common stock traded actively on the New York Stock Exchange ("NYSE") under the ticker symbol.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

26.     According to the Plan's Form 5500, Defendant HP is the Plan's sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B) and the Plan's administrator pursuant to ERISA § 3(l6)(A), 29 U.S.C. § 1002(l6)(A). Defendant HP is a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that it has discretionary authority and control regarding the administration and management of the Plan and/or the Plan's assets.

**C.     The Plan And Investment Review Committee Defendants**

27.     Defendant Plan Committee (the "Plan Committee") served, upon information and belief, as a "named fiduciary" of the Plan during the Class Period. The Plan Committee, upon information and belief, has the power and authority to interpret and administer the Plan, appoint individuals to assist with Plan's administration and discretionary authority and control regarding the administration and management of the Plan and/or the Plan's assets.

28.     Defendant Investment Review Committee (the "Investment Review Committee" or "IRC") served, upon information and belief, as a "named fiduciary" of the Plan during the Class Period. The Investment Review Committee, upon information and belief, has the power and authority to make decisions and impose restrictions regarding the investment options of the Plan and/or the Plan's assets.

29.     Defendants Plan Committee and Investment Review Committee are and were, at relevant times, comprised of HP's Directors.  The identity of the names of these HP Directors are known to Defendants, and Plaintiff hereby puts these persons who are Plan fiduciaries on notice that they will be substituted in at a later time when their names become known through discovery.

30.     Defendants John Doe "Fiduciaries" 1-50 are additional fiduciaries under the Plan whose identities are not known.

**IV.     HP'S 401(K) PLAN**

31.     The Plan is a defined contribution benefit plan that is sponsored by HP for all HP employees. As of December 31, 2011, according to the Form 5500 filed by the 401(k) Plan, there were 157,492 participants in the Plan.  The Plan also had total assets of approximately $13.9 billion.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

32.     Under the Plan, eligible participants who are all full-time employees and regular part-time employees may contribute up to 50 percent of their pre-tax income.   The Plan participants' contributions fund an account in their name held in trust with the Plan's trustee.  Plan participants also are eligible for a matching contribution of up to 4 percent which is subject to a three-year vesting cliff (the percentages or vesting may differ for certain participants).

33.     Plan participants make their contributions through payroll deductions and can direct how their contributions are invested in their accounts.  As of December 31, 2011, the Plan offered various "Tiers" of investment options which included birth date funds, index funds, actively managed institutional funds, specialty asset class funds and an open mutual fund window through Fidelity brokerage.  Additionally, the Plan offered the HP Common Stock Fund which invests predominantly in HP common stock.

34.     The Company strongly encourages employees to invest for their retirement through the Plan as it has an established HP Retirement Center and website for HP employees where they can get information on the Plan and their benefits.  It also sends newsletters to employees in which investment through the Plan is encouraged.

A.     **The "Named Fiduciaries" And Their Authority Under The Plan Document**

35.     The Plan is governed by Hewlett-Packard Company 401(k) Savings Plan as amended and restated as of January 1, 2012 (the "Plan Document").  The Plan Document sets forth the terms, conditions, and provisions of the Plan.   It also identifies and empowers the Plan Administrator and establishes and empowers the Plan Committee and Investment Review Committee.  Together, these are the "Named Fiduciaries" of the Plan.

36.     The Plan Document, in Section 9, sets forth certain duties and responsibilities that relate to "The Investment Funds" available under the Plan, including the HP Common Stock Fund. In particular, Section 9(f) empowers the Plan Committee and Investment Review Committee to restrict or limit the offering of any fund or funds including the HP Common Stock Fund in their discretion.

37.     For example, Section 9(f) provides:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

(f) Restrictions on Trading.
Notwithstanding any provision in the Plan to the contrary, the Plan Committee or
the IRC is authorized to impose from time to time any restrictions or limitations on
any or all Participants' ability to direct the investment of his, her or their Accounts
into or out of a certain Fund or Funds as the Plan Committee or the IRC may deem
appropriate in its sole and absolute discretion.

38.     The Plan Document authorizes the Plan fiduciaries to take appropriate measures to limit or restrict the acquisition of HP stock by Plan participants while it has become imprudent.

39.     Additionally, in the Plan's 2011 Form 5500 filed with the IRS on October 14, 2012, HP acknowledged that the Plan fiduciaries had taken action in the past to restrict investments in company stock by Plan participants.   HP stated that:

Effective January 1, 2010, new guidelines were imposed on participants' ability to
invest in the Company common stock, with a goal of limiting        investments   in
Company common stock to a maximum of 20% of a participant's portfolio. Under
the new guidelines, if a participant's account currently has more than 20% invested
in the Company common stock fund, the participant will not be forced to reduce his
or her holdings; however, the investment election for ongoing contributions and
loan repayments will be limited to a maximum of 20% in the Company common
stock fund, and any percentage above the 20% limit for ongoing contributions will
automatically be directed to the appropriate Birth Date Fund based on the year the
participant was born. In addition, the new guidelines provide that future requested
exchanges into the Company common stock fund will be blocked if the requested
change will cause the participant to exceed the 20% limit or if the participant is
already at or above the 20% limit of the Company common stock fund to the
participant's overall portfolio balance. Finally, the new guidelines provide that if
the participant chooses to rebalance his or her portfolio, the respective holdings in
the Company common stock fund will be limited to a maximum of 20% regardless
of the current investments in the Company common stock fund.

40.     The Plan's adoption of these restrictions in January 2010 demonstrates that the Plan fiduciaries had the authorization and discretion to place limits or restrictions on investments in HP stock.  These limits which restrict concentration demonstrate that the Plan fiduciaries were aware of the Plan's high concentration levels in HP stock, and the potential risks this posed to participants' retirement savings.

**B.      The Summary Plan Description**

41.     Pursuant to its obligations under ERISA, Defendants authored and issued "Summary Plan Description" to Plan participants.   The "Summary Plan Description" dated

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 9 -

January 1, 2012 ("SPD") references and incorporates HP's SEC filings, as well as acknowledges that the Plan fiduciaries had discretion to place restrictions on investments in HP stock.

42.     For example, the SPD states that "HP may impose additional restrictions on trading within the Hewlett-Packard Stock Fund or any other investment option, in its discretion."

43.     In addition, the SPD not only repeatedly references the 20 percent limitation on investing in HP stock set forth in the Form 5500, it also refers to other restrictions placed on former employees who wish to invest in HP stock.  For example, the SPD states that "...if you are a former employee who participated in the Compaq 401(k) Investment Plan and terminated employment before May 2, 2002, or if you are a former employee who participated in the EDS 401(k) Plan and terminated employment before August 26, 2008, you are not eligible to make new investments in the Hewlett-Packard Stock Fund."

44.     The SPD further specifically references and incorporates HP's SEC filings into it as communications made to Plan participants pursuant to ERISA.  Page 73 of the SPD provides as follows:

> The United States Securities and Exchange Commission (SEC) allows companies to incorporate by reference the information they file with the SEC, which means that HP can disclose important information to you by referring you to those documents. The information incorporated by reference is considered part of this summary/prospectus, and information filed with the SEC later will update and supersede this information. The documents listed below and any future filings made with the SEC under Sections 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), until the Plan is terminated, are incorporated by reference:
>
> • Hewlett-Packard's annual report filed on Form 10-K for the year ended October 31, 2011, filed December 14, 2011;
>
> • Any reports filed by Hewlett-Packard pursuant to Sections 13(a) or 15(d) of the Exchange Act since the end of the fiscal year covered by Form 10-K for the year ended October 31, 2011; and
>
> • The description of Hewlett-Packard Company common stock contained in Hewlett-Packard's registration statement filed under the Exchange Act, including all amendments and reports updating the description.
>
> Upon your written or oral request, HP will provide you, without charge, a copy of any or all of the documents filed with the SEC and incorporated by reference in the summary/prospectus (other than exhibits to such documents, unless the exhibits are

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 10 -

specifically incorporated by reference in such documents), including the plan document, HP's most recent annual report to shareowners, and any other documents required to be delivered to you pursuant to Rule 428(b) under the Securities Act of 1933.

## C.   The Plan's Concentration in HP Stock

45.     Before the Class Period, Defendants knew that the Plan was heavily concentrated in HP stock. The Plan's Form 5500s reflect the following holdings of HP stock:

| Year | HP shares | Value |
|------|-----------|-------|
| 2010 | 22,001,013 | $926,242,647 |
| 2011 | 21,790,323 | $561,318,720 |

46.     Footnote 8 of the Plan's Form 5500 for 2011 shows that in 2011, there were total purchases of $57,609,398 of HP stock, and in 2010, there were total purchases of $21,229,235 of HP stock.

47.     Defendants also knew that the HP Common Stock Fund had no diversification. For this reason, the Plan fiduciaries likely adopted the concentration restrictions in January 2010.

48.     By the time of the Class Period, HP stock had become an imprudent investment. Defendants should have taken actions to restrict new investments in HP stock and/or diversify out of HP stock. As a result of Defendants' failures, the Plan suffered substantial losses and damage from its transactions in and holding of HP stock.

## D.   The Plan's Significant Losses During the Class Period

49.     On February 11, 2011, at the start of the Class Period, HP's common stock price closed at $48.64 per share. During the Class Period, HP's stock price traded at artificially high prices, then it began to fall as the truth began to emerge – first, about its failed strategic plans for webOs, then about the accounting fraud and overpayment for Autonomy.

50.     On November 21, 2012, at the close of the Class Period, HP's common stock price closed at $11.17 per share.

51.     During the Class Period, Plan participants who invested in HP common stock at artificially high prices were substantially damaged. Plan participants were relying upon the integrity of the market price of HP common stock and market information relating to HP, and have been damaged thereby.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

52.     Plan participants also suffered damage as measured by the difference between holding HP common stock versus other investment alternatives under the Plan.

53.     Had Defendants acted prudently by suspending transactions in HP stock through the Plan or divesting out of HP stock, Plan participants would have avoided the substantial damage suffered.

## V.     FACTS BEARING ON BREACH OF FIDUCIARY DUTIES

### A.  HP Business Overview

54.     HP is among the world's largest information technology companies with operations in more than 170 countries and $127.2 billion in revenue in fiscal year 2011. HP describes itself as the leading provider of technology-related products, technologies, software, solutions and services to individual consumers, tall and medium-sized businesses and large enterprises, including customers in government, health and education sectors.

55.     HP is the world's leading vendor of PCs through its Personal Systems Group ("PSG") segment, commanding nearly 20 percent of the worldwide PC market in 2010. According to preliminary data, HP continued to lead the worldwide PC market in 2011 with 17.7 percent of market share by units shipped. HP's PSG Group provides PCs, handheld computing devices including tablets and smart phones and other products and services for the commercial and consumer markets.

56.     HP is also a leading provider of printers and printing supplies through its Imaging and Printing Group, which is its third-largest business segment.

57.     By at least February 12, 2011, the start of the Class Period, Defendants had every reason to be strictly monitoring and closely following HP stock as a potentially imprudent investment.

### B.  HP Acquires EDS For $13.9 Billion

58.     In May 2008, HP announced the acquisition of EDS for $25 per share or $13.9 billion.   At the May 13, 2008 conference call, Mark Hurd, HP's CEO made the following comments about the acquisition:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 12 -

This acquisition, which we expect to close by the second half of calendar 2008, is estimated to more than double HP's services business and creates a leading force in global IT services industry.

We will be a stronger business partner, delivering to customers one of the broadest, most competitive portfolios of products and services in the industry. In calendar 2007 our companies' collective services businesses had more — had revenues of more than $38 billion and 210,000 employees doing business in more than 80 countries. Today's transaction is compelling financially, compelling strategically and compelling commercially. From a financial perspective it is expected to be accretive to EPS on a GAAP basis in fiscal 2009 and accretive on a non-GAAP basis in fiscal 2010.

Strategically acquiring EDS fulfills our stated objective of expanding in the services areas. It will enhance the global scale of HP's outsourcing service delivery capabilities, particularly in Europe and the Americas. It will expand our offerings in such segments as applications outsourcing, and it will extend our reach in such vertical industries of government and manufacturing.

Customers will benefit from a highly skilled business partner with a leaner cost structure and a broad global presence. This reinforces our commitment to help them manage and transform their technology to achieve better results. And employees will benefit from the opportunities that are created through this acquisition; including our ability to compete more effectively in existing areas and push into new growth opportunities.

Signaling the importance of services will add to HP going forward; we intend to establish a new business group to be branded EDS and HP Company. It will be led by EDS's Ron Rittenmeyer, and remain headquartered in EDS's base of Plano, Texas, a community that we remain very much committed to. I am pleased to say that Ron will report directly to me and be responsible for running one of the most exciting businesses in the industry.

59.    In its annual report for 2009 filed on Form 10-K, HP described the EDA acquisition as a "critical component" of its growth strategy, and that the acquisition increased the size and breadth of our services business and enabled us to provide comprehensive IT product and services solutions to our customers.

60.    Notwithstanding, almost immediately after the deal, HP announced plans to terminate 24,000 workers, and eliminate redundant offices. The intended growth from the EDS acquisition never materialized and, ultimately, HP grossly overpaid for EDS.

61.    In August 2012, HP announced that it was taking an $8 billion write-down in goodwill. It disclosed that profit margins had been eroding for some time within the division.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

1  Plan fiduciaries knew or should have known that the EDS acquisition was a failure, and not

2  providing HP with necessary growth which was the reason for its purchase.

3  **C. HP Acquires Palm and Presents Strategic Vision For Connected webOS Devices**

4  62.    Palm is widely credited as having pioneered the portable, hand-held computer

5  device in the 1990s with its invention of the first Personal Digital Assistant ("PDA"), the

6  PalmPilot. Palm's own operating system, Palm OS, powered its PDAs. In January 2009, Palm

7  unveiled its new mobile operating system, called webOS, which was web-based, meaning that it

8  was built on the same technology used by many web browsers.  In June 2009, Palm released its

9  first smartphone powered by webOS, the Palm Pre, on the Sprint network.

10  63.    On April 28, 2010, HP announced that it would acquire Palm for $1.2 billion. HP

11  bought Palm in order to acquire webOS, calling it the cornerstone to expanding the Company's PC

12  business and building its own line of web-connected mobile devices, including smartphones and

13  tablets, in order to compete with Apple's iPhone and iPad, which run on Apple's own iOS

14  operating system, RIM's blackberry OS, and other mobile devices powered by Google's Android

15  OS.   HP Executive R. Todd Bradley, who left Palm in 2005 to lead PSG at HP, was the

16  "mastermind" behind the Palm acquisition. Bradley also characterized the Palm acquisition as a

17  "transformational deal" for HP in an increasingly mobile world. *See* Jon Swartz, "HP to acquire

18  Palm for about $1.2B," *USA Today*, April 29, 2010.  HP executives were also enthusiastic about

19  the acquisition and conveyed the Company's plans to "double down on webOS," stating that they

20  were "very excited about webOS" and saw "great potential" in it. *See* John Paczkowski, "HP

21  'Doubling Down' on Palm's webOS," *All Things Digital,* Apr. 28, 2010.

22  64.    The news media generally applauded HP's acquisition of Palm, pointing out the

23  tremendous business potential that controlling its own mobile operating system could represent for

24  HP, including extending webOS to multiple devices. As one columnist for *All Things Digital,* a

25  respected technology news website associated with the *Wall Street Journal,* explained:

> In Palm's webOS, H-P has an elegant OS that it controls, something the company a
> longtime Windows shop – has never had before. And with it, it can begin
> untethering itself from Microsoft and differentiate its brand in a market in which
> most devices not sold by Apple are all running some variant of Windows.
> Remember, webOS is scalable. And while Palm lacked the means to scale it, H-P

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

does not. It's one of the biggest tech companies in the world, and once it brings its engineering acumen and marketing heft to bear on the OS, my guess is *we'll see it evolve into a much larger platform that extends beyond smartphones to tablets, ultraportables and other connected devices.* And H-P, for the first time in its history, will be firmly in control of both its hardware and software.

*See* John Paczkowski, "HP 'Doubling Down' on Palm's webOS," *All Things Digital,* Apr. 28, 2010. (Emphasis added.)

65.     HP completed the Palm acquisition on July 1, 2010. In a press release that day, HP extolled the opportunity that the deal represented for HP:

> The combination gives HP significant headway into one of technology's fastest-growth segments with Palm's innovative webOS platform and family of smartphones, plus a rich portfolio of intellectual property from the smartphone pioneer. HP's global scale and financial strength plus Palm's award winning webOS experience, as well as its acclaimed Pre and Pixi smartphone product lines, enhance HP's ability to participate more aggressively in the highly profitable, $100 billion smartphone and connected mobile device markets.

66.     In a July 1, 2010 post on its new "Official HP Palm blog," HP emphasized the potential for multiple webOS devices, noting that "[t]he combination of Palm's trailblazing webOS and HP's strength as the leading provider of *everything from pcs, laptops, and printers* to home electronics and enterprise systems *promises an amazing roadmap of new tools for your mobile and web-connected future."*

### 1.     HP Introduced Its Strategy to Extend WebOS Across Multiple Devices

67.     HP repeatedly represented that it would extend webOS beyond smartphones and tablets to include PCs and printers by sometime in 2011 or 2012 (i.e., by the end of 2012 at the latest), and that it expected sales of webOS-enabled devices would exceed 100 million units annually. HP misled the market into believing that development of webOS PCs and printers was well under way.

68.     On January 7, 2011, in an interview with CNBC at the annual Computer Electronics Show (CES), Bradley described HP's plans to unveil its new web OS devices, centering on a webOS-based tablet, at an upcoming HP event. This tablet, the TouchPad, would be

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 15 -

1  the first tablet to ship with an operating system other than Apple's iOS or Google's Android.

2  Bradley declared that HP is "totally focused on the tablet market, totally focused on enabling that

3  with webOS," emphasizing that "we think of this broadly as the tablet is *one piece of that*

4  *ecosystem, one piece of that connected experience* that we're going to create." *See*

5  www.engadget.com/2011/01/13/hps-todd-bradley-all-but-confirms-webOS-tablet-for-february-9t/.

6      69.    Bradley explained that by "ecosystem," he meant that HP was planning to extend

7  webOS to PCs specifically, in addition to other devices: "[A]s we think about how [webOS]

8  enables everything from smartphones to tablets to PCs to potentially other large screen devices,

9  we see an enormous, enormous opportunity ..." *Id.*

10     70.    On February 9, 2011, HP hosted a major event in San Francisco called "Think big.

11  Think small. Think beyond: webOS Announcement," (the "February 9 Event") at which it

12  unveiled the TouchPad as well as two new webOS-based smartphones, the Veer and the Pre3. At

13  this event, Bradley described these three devices 'as "the building blocks" of HP's "long term

14  strategy" to expand webOS beyond tablets and smartphones and across a wide range of products,

15  totaling more than "100 million" webOS devices per year. Bradley stated that HP would "extend

16  the webOS footprint even further as the year progresses, taking webOS to other connected devices,

17  *including printers,* some form factors you haven't seen before, and as we think about how we

18  enter markets, how HP enters markets, we do so with meaningful intent, *with significant*

19  *resources,* and our goal, our commitment, *to extend the webOS experience across the broadest*

20  *range of devices* for our customers *and creating the largest install base possible for our*

21  *developers.* "

22     71.    Bradley specifically mentioned that HP's "plans *to bring webOS to* the HP device

23  that has the biggest reach of all: *the personal computer,*" would occur *"later this* year.*"* HP also

24  announced at the February 9 Event that developers large and small, including Facebook, Amazon

25  and Selfaware Games, as well as content providers like Time Inc. and hybrid providers like

26  DreamWorks, were partnering with HP to develop mobile applications for its webOS devices.

27     72.    Bradley emphasized the importance of webOS-enabled connectivity between

28  devices:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

Since acquiring Palm, we've deployed hundreds of additional engineers to what was already a very talented team of designers with an awesome leader in Jon Rubinstein with a phenomenal vision of *connectivity*.....When Jon and I had our first really serious sets of discussions about the future of the connected device world, *the connected device market,* I was convinced that we could make a contribution....So we have more and more people accessing more and more cloud based content from more mobile devices. I think that's a lot of 'more's.' But *no one before today has come forward, developed a solution that works ubiquitously across these devices,* that provides that consistent experience, a solution that responds to how you look up information, how you access entertainment, how you stay connected on the go, *a solution that gives you effortless access to that digital universe, no matter which HP device you use.* This work is precisely the place we're focusing on delivering value by seamlessly connecting our customers' worlds, seamlessly connecting all that content, and our intention with webOS devices is really enable people to transform how they think, how they feel, and how they connect, and we start with unique and differentiated technology, *then we'll apply it across a portfolio* in ways that is going to thrill, engage, frankly excite consumers and developers alike.

73.     The February 9 Event included a chatty demonstration of how webOS enabled the apparently seamless connection between the webOS smartphones largely developed at Palm prior to the acquisition) and the TouchPad, or what the Company called "the magic of HP webOS":

Today, HP is entering the mobile landscape with a breakthrough new product that shows *the power of webOS as a multi-device platform....* And best of all, using our next generation TouchStone technology, *our new webOS devices can actually share information wirelessly, so they work better together.... TouchPad and Pre 3 talk to each other* so I can do all my texting from right here. I can also take phone calls from [the TouchPad] so I don't have to go pick up my phone, and using Touchstone technology, the setup is super easy, just one touch, and that's all it takes.... These are a couple of examples of *how webOS helps me seamlessly integrate my devices,* and I'll show you a *few more examples shortly So that's video calling from my TouchPad to Jon's Pre 3* ... Going to Mamacita. I've never been there before, so let me check it out, launch their website, hungry, wow, that looks like a nice restaurant! I can definitely see myself having a couple of margaritas there tonight! I need to check out their menu in the taxi, but I'm not bringing my TouchPad with me. However, I am bringing my Pre 3, and *when we bring the two together, we can make magic happen.* So here's my Pre 3 on the TouchPad, something's going on, launches the browser, let's put it in landscape, a few moments for the page to load here. A lot of people hitting their site, I assume. And there you go. We call this Touch 2 Share. Using Touchstone technology, *you can easily pair webOS devices; you can exchange information between them so they can work better together.* And *that, ladies and gentlemen, is the magic of HP webOS.*

74.     Analysts were impressed. A February 9, 2011 Wells Fargo report commented, for

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 17 -

1    example, that "this [webOS] software release looks very good and topped our expectations,"

2    concluding that it was "a very compelling operating system release."

3         75.    A February 10, 2011 J.P. Morgan report similarly stated:

4         We believe that shares of Overweight-rated Hewlett-Packard stand to enjoy a
          positive 'shot-in-the-arm,' following this tablet announcement as a potential near-
5         term catalyst. In our view, the hardware and software specs of the TouchPad appear
          to be better than what investors expected.

6         76.    The J.P. Morgan report also emphasized that:

7         *webOS could represent a new line in the sand for PCs, not just tablets.* HP
          foreshadowed the increasing reach of webOS, indicating that the operating system
8         would reach the company's notebook PCs later this year. We think that this plan
          could gradually chip away at the long-held dominance by Windows.
9

10        77.    Consistent with HP's positive statements and analysts' bullish responses, the

11   February 9 Event drove HP's stock to its Class Period intraday high $49.39 on February 10, 2011,

12   before closing at $48.54 that day. The stock remained buoyed thereafter, reaching its high Class

13   Period close of $48.99 on February 16, 2011, four trading days later.

14        78.    During the ensuing months, HP repeatedly touted webOS's "seamless"

15   connectivity over a broad device "platform." For example, during HP's February 22, 2011

16   earnings call for the second fiscal quarter of 2011, CEO Leo Apotheker ("Apotheker"), noting that

17   the "enthusiasm and anticipation for webOS exceeded even our most optimistic expectations,"

18   stated that HP would leverage webOS to "provid[e] a *differentiated seamless experience across

19   our tablets, smart phones, printers, PCs* and future form factors." *See* Q1 2011 Hewlett Packard

20   Earnings Conference Call Transcript February 22, 2011 at 2.

21        79.    On March 14, 2011, HP held a "much anticipated" HP Summit for industry

22   analysts and the media.[2] Apotheker represented that HP was "getting ready to roll out webOS on a

23   massive scale," such that after the launch of the two new webOS smartphones and the TouchPad

24   in the summer, "there will be *wave after wave* of technology coming out to support the webOS

25   platform." He further promised that HP would put webOS across a wide range of its products,

26   including PCs and printers, with the plan "to reach 100 million devices a year" so that HP would

27   _____

28   [2]    Benjamin Pimentel, "After 'Rocky' Start, HP-Chief Aims For Reboot," *Wall St. J.*, Mar. 14, 2011.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

1    enable it to "become a very massive, very broad platform." As Apotheker succinctly explained,

2    "going forward we don't intend to play in the junior league in this business either."

3         80.    Bradley also gave a presentation on HP's webOS "connectivity" strategy, in which

4    he said that HP's "goal with webOS and our unique opportunity is *really to extend webOS to the*

5    *broadest range of products available*" and that HP will "*be extending the ecosystem beyond smart*

6    *phones and tablets.*". Bradley further stated that "[d]evelopment teams across HP are working to

7    bring webOS and the webOS experience to the Windows PCs," and specified that "*[n]ext year,*

8    *we'll migrate tens of millions of web connected printers into the ecosystem.*"

9         81.    On May 17, 2011, before the opening of trading, HP held a conference call for

10   investors and analysts to discuss the Company's second quarter 2011 financial results. During the

11   call, a Morgan Stanley analyst asked about HP giving missed its earnings guidance two quarters in

12   a row and potentially exiting the PCs business entirely. Apotheker emphasized HP's "great

13   strategy to execute towards our *connectivity approach*" (referencing the webOS product line),

14   noting that "we are very excited about our TouchPads coming out in particular in the summer.

15   And as we all believe that there will be a convergence of these different form factors over *time-*

16   *TouchPads, pcs, et cetera, and in particular, notebooks*—we believe this is a great opportunity for

17   HP to participate in this."

18        82.    Analysts came away satisfied that HP would continue leveraging webOS to grow

19   its PC business. Credit Suisse, for example, reported that "[m]anagement are arguing for a

20   recovery in consumer PCs driven potentially by introduction of the TouchPad and tablet strategy."

21        83.    Apotheker continued to make assurances regarding a broad webOS device platform

22   in the weeks leading up to the release of the TouchPad to the market. On June 1, 2011, Apotheker

23   gave a sit-down interview about HP's webOS  at the *All Things Digital* D9 conference in Los

24   Angeles. He reiterated that HP would "*create as holistic an ecosystem as we can*" for webOS, and

25   declared that in addition to the TouchPad and webOS smartphones, HP would put webOS "*on*

26   *every PC that we'll ship*" and "*on every printer we ship above $100,*" so that the number of

27   webOS-enabled devices would total "*100 to 110 million devices a year.*"

28        84.    The next day, at a Sanford C. Bernstein & Co. Strategic Decision Conference,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

Apotheker reinforced that HP would build a broad webOS device platform, assuring the market that *"webOS is ready for prime time."* He also "reconfirm[ed] that *webOS will be available on PCs,* on top of Windows, which creates a whole new market dynamic for webOS" and added that *"we are going to put webOS also on printers,"* to "create the kind of *a platform of about 100 million, 110 million devices a year."*

85.    Upon information and belief, Defendants' repeated assertions that webOS would be all "millions" of PCs and printers in a short time frame (varying from the end of 2011 the end of 2012, but no later) were not true. HP's webOS software team was stretched to capacity trying to ready the problematic TouchPad for launch, and had no resources available to work on developing the webOS code for printers and PCs making it impossible for webOS-enabled PCs and printers to be market ready in Defendants' asserted time period. Nor was there ever a Plan of Record for webOS PCs and printers, which was a required early step in the development process.

### 2.    HP Releases The TouchPad With Numerous Software Flaws And Bugs

86.    The TouchPad, released on July 1, 2011, was supposed to be HP's flagship webOS product and the cornerstone for the announced "ecosystem" of seamlessly connected webOS devices. During the preceding months, Apotheker trumpeted HP's enthusiasm for the TouchPad and the Company's strategy to produce a broad platform of webOS devices - including PCs and printers - with the ability to connect to each other. To that end, Apotheker assured investors that "webOS is ready for prime time" and that HP, with him as CEO, "would not release a product that isn't perfect."

87.    At that time, and months prior to the TouchPad's release, however, HP knew that the TouchPad was far from "perfect" and indeed had serious flaws, and that the webOS operating system on the flagship TouchPad - let alone other devices in the ecosystem - was not remotely "ready for prime time." The development of the tablet was problematic from the time it was unveiled to the public on February 9, 2011.

88.    The iPad 2, Apple's eagerly anticipated follow-up to its wildly successful, market-defining iPad tablet, was unveiled to the public on March 2, 2011 and released for sale in the United States on March 11. It was an immediate success. Having shown the TouchPad to the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

1   market, the Palm GBU scrambled to release it for sale to try to compete with the iPad 2.

2         89.    The TouchPad was flawed from the time it was unveiled, and persons attending the

3   February 9 Event could only look at the TouchPads. They were not permitted to handle or use

4   them because of the many "bugs" in the webOS software. In the months following the February 9

5   Event, the Palm GBU software engineers continued to struggle with the development of the

6   webOS software, missing internal milestones for the platform and experiencing subsequent delays.

7   TouchPad launch dates kept getting pushed back.

8         90.    HP rushed to meet the July 1 release date in order to attempt to compete with the

9   iPad 2. The software engineers were trying to develop the webOS software for the TouchPad and

10  two smartphones at the same time, and they lacked sufficient resources to proper develop both.

11        91.    The TouchPad had problems that needed to be rectified prior to the launch but were

12  not. The TouchPad had problems with its performance, booting up in WiFi locations, "memory

13  usage," stability issues *(i.e.,* the software would keep crashing), and Skype integration. The

14  TouchPad also would have difficulty competing with the iPad because it lacked the thousands of

15  apps that Apple offered at the same price point.

16        92.    Despite the TouchPad's problems, HP executives continued to assure investors that

17  HP's webOS ecosystem strategy was sound. As reported by *All Things Digital* just a few days

18  later, on July 6, 2011:

19      Hewlett-Packard has a lot riding on the launch of the TouchPad.
    The tablet, which went on sale last week, doesn't just represent HP's effort to take
20  on the iPad. *It's also the start of what the company hopes will be a renaissance for
    webOS,* the operating system HP acquired with its acquisition of Palm a year ago
21                               * * *

22      In recent interviews *HP executives have talked about the importance of web*OS *to
    the core of the company's* business. HP is counting on webOS to power a range of
23  devices, from future tablets to the Pre3 and other smartphones. *HP is also looking
    to boost the operating system's presence by making it available on printers as well
24  as from within its Windows PCs.*

25      "We've got lots of capabilities that we have to bring to scale," HP Executive Vice
    President Todd Bradley told AllThingsD. "We've just got to do it."
26

27      Bradley wouldn't commit to a schedule for when future devices would hit the
    market after the already announced Pre3, *but he said the company is committed to a
28  broad webOS lineup.*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

93.     On July 11, 2011, in a press release titled "HP to Drive Innovation, Scale and Growth of webOS," HP announced that it was reorganizing the PSG Division in order to "accelerat[e] the global expansion of webOS." "To support this next phase of growth," HP stated that it was appointing Stephen DeWitt, another PSG executive, to Rubinstein's former position as head of the Palm GBU, now renamed the webOS GBU, while Rubinstein, "the visionary behind webOS," would assume a product innovation role within PSG, still reporting to Bradley and working on webOS.

94.     On July 20, 2011, Bradley was interviewed by *Bloomberg News,* in a segment titled "Bradley Says HP to Invest Aggressively in TouchPad." Bradley again professed HP's continued commitment to the recently launched TouchPad and to webOS as the cornerstone in HP's strategy "to build [a] ubiquitous set of products" across its PC, printing, cloud, and other businesses. *Bloomberg* noted that there were indications that "the TouchPad isn't selling well" and asked Bradley whether HP had a "plan B" if that were true. Bradley denied the rumors of poor sales, reassuring investors about HP's continued commitment to the TouchPad: "I would tell you that we're very happy with the ramp, we'll continue to invest very aggressively . . . ."

### D.     HP Suddenly Abandoned Its WebOS Strategy To Integrate Mobile Devices

95.     On August 18, 2011, approximately one hour before the close of trading,   HP issued a press release titled "HP Confirms Discussions with Autonomy Corporation plc Regarding Possible Business Combination; Makes Other Announcements."   In this press release, HP announced several sudden shifts in strategy together with preliminary third quarter 2011 financial results and severely reduced earnings guidance for fiscal year 2011.

96.     In a stunning reversal of its webOS expansion strategy, the Company reported that it would "discontinue operations for webOS devices, specifically the TouchPad and webOS phones," and thus acknowledged that no other webOS products (including PCs or printers) would be developed.   HP additionally revealed its plans to explore "strategic alternatives" for PSG, including "a full or partial separation of PSG from HP through a spin-off or other transaction." HP also confirmed that it was "in discussions" to acquire Autonomy Corporation ("Autonomy"), a large British enterprise software firm, later confirmed at $10.3 billion.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 22 -

97.     This announcement was the first of the shocking gross management failures by HP. Plan fiduciaries knew or should have known that since the start of the Class Period through the August 18, 2011 announcement that HP's stock price was artificially inflated from materially false and misleading statements of HP's webOS expansion strategy.

98.     HP's material misstatements were incorporated by reference into the SPD and relied upon by Plan participants in their investment decisions to purchase and hold HP Stock. HP's material misstatements inflated the price of HP's common stock and maintained that price at a higher level than would have resulted from disclosure of true condition of HP's operations and prospects with respect to webOS products, both launched and still purportedly in development.

99.     After the truth became known August 18, 2011, the price of HP stock declined precipitously as the artificial inflation was removed from the stock price, causing substantial economic injury to members of the Class.

100.    Just after market close on August 18, 2011, HP elaborated on these announcements in a series of press releases issued in rapid succession and marking a major "company transformation." In a press release titled "HP Reports Third Quarter 2011 Results and Initiates Company Transformation," the Company confirmed that it would "discontinue operations for webOS devices, specifically TouchPad and webOS phones. The devices have not met internal milestones and financial targets. HP will continue to explore options to optimize the value of webOS software going forward." Plan fiduciaries knew or should have known that the internal milestones were not met.

101.    In this press release, HP also announced sharply reduced earnings guidance under generally accepted accounting principles ("GAAP") for the full 2011 fiscal year, from the Company's previous GAAP guidance, issued on May 1,2011,of $4.27 per share ("EPS"), to EPS of $3.59-$3.70. The reduction in GAAP-EPS guidance was the result of the webOS shutdown. As announced in the August 18, 2011 press release, the revised guidance was "related primarily to restructuring and shutdown costs associated with webOS devices, the amortization and impairment of purchased intangibles, restructuring charges and acquisition-related charges." Similarly, HP's CFO advised during the August 18, 2011 earnings conference call that "for GAAP

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 23 -

1  guidance, we expect to take a GAAP-only cash charge of approximately $1 billion for

2  restructuring and shutdown costs related to webOS devices," and offered no other explanation for

3  the guidance shift.

4    102.   More specifically, as reported in the 2011 Form 10-K, HP suffered an extraordinary

5  $1.6 billion loss from operations due primarily to $755 *million* of expenses HP was obligated to

6  pay suppliers following the webOS shutdown. HP also recorded an *$885 million* charge for

7  impairment of goodwill and purchased intangible assets, and a restructuring charge of $33 million,

8  specifically in connection with the webOS shutdown. Ultimately, as reported in the 2011 Form 10-

9  K, the webOS shutdown caused HP's fiscal 2011 earnings from operations to be reduced by

10  $1.673 billion.

11    **E.    HP's Stock Plunges And Damages Plan Participants**

12    103.   The market was shocked by the flurry of news, including HP's drastic decision to

13  shutdown webOS and deep reduction in earnings guidance for fiscal 2011. As this news began to

14  seep into the market on August 18, 2011, the Company's stock price declined $1.88 from its

15  $31.39 closing price on August 17, to close at $29.51. This represented a one-day decline of

16  nearly 6 percent, on unusually high trading volume exceeding 96 million shares. This trading

17  volume was nearly five times the average trading volume of 19.6 million shares during the 30

18  preceding trading days.

19    104.   HP stock was hammered the next day by massive sales as the market fully digested

20  the August 18, 2011 news. On August 19, 2011, the stock price plunged to as low as $22.75 before

21  closing at $23.60 on extraordinarily high trading volume of nearly 129 million shares. The $23.60

22  closing price was less than half of the stock's intraday Class Period high of $49.39 on February

23  10, 2011, the day after HP's February 9 Event and HP's lowest close in six years.

24    105.   The $5.91 per-share drop on August 19, 2011 represented a loss of *20 percent* of

25  the stock's value, erasing more than $12 billion in market capitalization, and was the largest

26  single-day percentage decline in HP's shares since the Black Monday stock market crash of

27  October 1987.

28    106.   In total, from close on August 17, 2011 to close on August 19, 2011, HP stock

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

plummeted $7.79 per share, or nearly 25 *percent,* on enormous trading volume, wiping out more than $16 *billion* in shareholder value. The Plan, which was invested in HP stock, suffered substantial loss in value to the participants' retirement savings.

**F.   HP Stock Deteriorates And Becomes Further Imprudent As An Investment**

107.   Multiple securities analysts promptly and sharply downgraded HP's stock in response to the August 18, 2011 news.   Robert Baird downgraded HP to "Neutral" from "Outperform." Cross Research downgraded HP to "Hold" from"Buy." Needham & Co. downgraded HP to "Underperform" from "Buy." Credit Agricole Securities downgraded HP to "Underperform" from "Outperform." And Deutsche Bank downgraded HP to "Sell" from "Hold."

108.   An August 19, 2011 Jeffries analyst report expressed surprise at HP's weak guidance and "dramatic changes" in webOS strategy:

> *After three failed attempts HP is finally kitchen sinking their guidance and outlook.* The company unveiled its plans to radically transform by acquiring Autonomy, spinning off PSG, and *discontinuing its Web OS hardware line.* While the Q3 report and corporate actions are disappointing, we continue to see significant value when looking at the sum of the parts. We trim our 2012 BPS est. to $5.50 but reiterate our Buy rating and $40 PT.
>
> * * *
>
> TouchPad discontinued, shutting down Web as hardware business: We had expected difficulties this quarter and next but *we had not expected the dramatic changes that are now occurring.* We were pleasantly surprised by  the decision to shut down Web as, in what now appears to have been a     *disastrous involvement. One has to wonder what legal representation and   warranties were made by the previous Palm management.*

109.   An Auriga USA analyst report on August 19, 2011 also reacted negatively to HP's announcements:

> *What a Mess!*
> *HP reported a soft quarter, provided even softer guidance, announced they might spin off the PC business, announced they were definitely shutting down the tablet/smartphone business,* and *topped all this off by once again massively overpaying for an acquisition.* Management acknowledged they need to fundamentally change the company, and *clearly suggested things are likely to get worse at HP before they get better, so we continue to recommend avoiding the HP "value trap",* and thus maintain a Hold rating while reducing our target to $43 from $45.

110.   The Company's August 18, 2011 announcements also spurred rating agencies to cut their ratings on HP's debt securities. Standard & Poor's reduced its rating to "creditwatch with

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 25 -

1  negative implications." Moody's lowered its rating to "negative" from "stable," citing "the

2  shutdown of [HP's] tablet and smartphone activities" among other news.

3      111.   An August 19, 2011 *Bloomberg News* article titled "HP Tumbles as Strategic Shift

4  Leads to 'Lost Confidence,'" reported the following regarding the webOS hardware shutdown and

5  loss of the webOS ecosystem:

> Apotheker is exiting WebOS products just a month after the company named
> Palm's former CEO Jon Rubinstein to head of product development and innovation
> for the personal systems group, which includes PCs, tablets and smartphones.
> *Apotheker said in March that all of the company's PCs will feature WebOS,* a shift
> away from machines that only run Microsoft Corp.'s Windows operating system.
> "He's decided he just can't win that war," said Maribel Lopez, founder of Lopez
> Research in San Francisco. *"If he's not going to be in devices on the PC side, it
> makes no sense to be in devices on the phone side."*

6

7

8

9

10     112.   The technology press also was shocked by HP's sudden flip-flop on webOS given

11  the Company's repeated proclamations regarding a broad platform of webOS devices including

12  PCs and printers, anchored by the flagship TouchPad. For example, an August 18, 2011 *All Things*

13  *Digital* article titled "HP and webOS:  But They Seemed So Happy Together!" highlighted the

14  suddenness of HP's abandonment of webOS, which contrasted starkly with what the Company,

15  including Bradley had said publicly as recently as July 2011:

> How quickly things change, right? Particularly for HP, *which just weeks ago was
> talking up the importance of webOS to its core business,* reiterating a message
> delivered by HP Executive Vice President Todd Bradley back in February at the
> company's big TouchPad unveiling.

16

17

18

* * *

19

> What happened between February and August? Hell, what happened between July
> and August, *after Bradley told AllThingsD's Ina Fried that HP was committed to a
> broad webOS lineup?* WebOS was supposed to be HP's *big consumer platform
> push.* ... Evidently, HP drastically rethought that commitment. Which raises the
> question: Was Palm worth the $1.2 billion HP paid for it? It certainly doesn't look
> that way today.

20

21

22

23     113.   Another technology reporter for *Mashable,* in an article the same day titled "RIP

24  TouchPad: HP To Shut Down WebOS Operations," had a similar reaction to HP's webOS

25  announcement, stating that "HP's about-face on webOS comes as a surprise, especially coming six

26  weeks after the TouchPad went on sale," and referring to the about-face as "more shocking" than

27  the news of a possible spin-off of the PC business.

28     114.   Finally, as reported in an August 19, 2011 article in the technology publication

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

1  *CRN*, titled "HP Partners Startled by TouchPad's Demise, Uncertain WebOS Future," one analyst

2  succinctly concluded:

> Chris Barnes, vice president of research and solutions development at Gap
> Intelligence, a San Diego-based research film that follows HP, wonders if the HP
> brass really believed the WebOS talking points, *"WebOS was such a linchpin of the*
> *company's overarching strategy; it was the virtual glue that tied together phones,*
> *PCs, tablets, printers,"* Barnes said. *"It really makes you wonder whether HP 's*
> *senior leadership ever really believed its own story about developing its own self*
> *supporting ecosystem,* vis-a-vis Apple. [It] sounds more like *they were dishing out*
> *the Kool-Aid but secretly drinking iced tea,"*

8    115.   HP and Apotheker in particular were widely criticized for flip-flopping on the

9  Company's strategic vision with respect to PSG and webOS.  For example, on August 28, 2011,

10 *The Wall Street Journal* published a scathing article on Apotheker's dismal performance as CEO

11 titled "H-P's One-Year Plan" with the following premise: "Let's say you were given a year to kill

12 Hewlett-Packard.  Here's how you do it."  The article outlined Apotheker's disastrous decisions

13 over the past year, in particular those related to HP's webOS business: "Remember that promising

14 webOS software H-P bought in a $1.2 billion acquisition of Palm last year? Sideline it."

15   116.   On or about September 22, 2011, just one month after the Company's August 18

16 announcements, the HP Board fired Apotheker.

17   117.   On November 21, 2011, HP announced that it wrote off approximately $3.3 billion

18 in after-tax costs for fiscal year 2011 due to "the wind down of HP's webOS device business."

19   118.   Finally, on December 9, 2011, HP announced that it would cut its losses and donate

20 webOS to the "open source" software community, making web0S free for anyone to use and

21 improve.  As the *Wall Street Journal* stated, "HP [was] making the guts of Palm free for the

22 world," getting "zilch" in return for its $1.2 billion Palm investment.[3]

23   119.   The negative implications - and irony - of HP's decision to open source webOS are

24 especially apparent in view of Bradley's remarks at the end of HP Summit nine months earlier, in

25 which he touted webOS as superior to Google's open-sourced Android operating system:

26

27 [3] Shira Ovide, "Hewlett-Packard Gets Zilch for WebOS," *Wall St. J,* Dec. 9, 2011.

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 27 -

We've got a very, very ... focused effort to create a developer environment that's very simple, very attractive, and we've gotten very, very good traction on that in the last three weeks since we put it out. So we'll probably never be as ... *we won't have the open field that Google has.*

I'm not sure that I think that's advantageous for customers. Actually, *we've seen lots of problems in the Android ecosystem with some of the security issues that [were] talked about as well as just performance issues.* So I think we're well positioned. I feel comfortable with where we are. I feel comfortable with our value proposition.

HP also confirmed in separate press releases after market close on August 18, 2011 that the Company would potentially spin-off PSG and would acquire Autonomy for $10.3 billion.

## G.   HP ENGAGES IN ANOTHER RECKLESS ACQUISITION OF AUTONOMY

120.    HP's spectacular webOS failure severely damaged the Company's credibility and competitive standing. With the announcement that it was abandoning its mobile device strategy, HP had further become an imprudent investment that the Plan fiduciaries should have restricted under the Plan. However, this was only the first of the two other major management failures that would be revealed.

121.    In the press release on August 18, 2011, announcing the acquisition, HP stated:

'Autonomy presents an opportunity to accelerate our strategic vision to decisively and profitably lead a large and growing space," said Leo Apotheker, HP president and chief executive officer. "Autonomy brings to HP higher value business solutions that will help customers manage the explosion of information. Together with Autonomy, we plan to reinvent how both unstructured and structured data is processed, analyzed, optimized, automated and protected. Autonomy has an attractive business model, including a strong cloud based solution set, which is aligned with HP's efforts to improve our portfolio mix. We believe this bold action will squarely position HP in software and information to create the next-generation Information Platform, and thereby, create significant value for our shareholders.'

Apotheker continued, 'Autonomy is a highly profitable and globally respected software company, with a well-regarded management team and talented, dedicated employees. We look forward to partnering with a company who shares our commitment to solving customer problems by creating smart, cutting-edge products and solutions. I am particularly pleased that Dr. Mike Lynch, who heads a team of brilliant scientists and employees, will continue to lead Autonomy. I look forward to our collaboration as we focus on creating maximum value for the combined company, its customers and employees.'

'This is a momentous day in Autonomy's history,' said Dr. Mike Lynch, chief executive officer and founder, Autonomy. 'From our foundation in 1996, we have been driven by one shared vision: to fundamentally change the IT industry by revolutionizing the way people interact with information. HP shares this vision and provides Autonomy with the platform to bring our world-leading technology and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

innovation to a truly global stage, making the shift to a future age of the information economy a reality.'

122.

122.    On September 13, 2011, nine days before he was released, HP's CEO participated in the following Q&A with analyst Chris Whitmore at the Deutsche Bank Technology Conference:

> [Apothekar]:  Autonomy—I'm sure we have many more questions on Autonomy, but, just to position that squarely in everybody's minds, the idea around Autonomy is to really strengthen HP's capabilities tremendously in this whole notion of data. We talked about data in san Francisco.  We will talk a lot about data, probably, today, as well, structured and unstructured. And, therefore, Autonomy is a very important asset.
>
> And let me just try to build one that and help you understand how we came to the valuation of Autonomy.  We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very conservative view on this.  Just to make sure everybody understands. Autonomy will be, on day one, accretive to HP.  For FY 2012, Autonomy, once we integrate it, it accretive to HP.
>
> Now, we have identified five synergy possibilities – five synergy leverages on how we can build up Autonomy business and how we can synergize it between HP and Autonomy.  And I can walk you through that, through these various elements.  But just take it from us.  We did that analysis at great length, in great detail and we feel that we paid a very fair price for Autonomy.  And it will give a great return to our shareholders.

123.    On September 22, 2011, after she took over, Meg Whitman ("Whitman") stated on a conference call regarding her appointment as President and CEO that "...the Autonomy acquisition, which I am excited about, is proceeding as planned, and is expected to be completed by the end of the calendar year."

124.    On November 21, 2011, during the fourth quarter earnings conference call, Whitman stated:

> Well, let me just spend a moment on Autonomy.  I am really excited about this acquisition.  As you all know, I think it really positions HP as a leader in the Next-generation information management and analytics capabilities, as the explosion of data is making these capabilities absolutely critical.  Autonomy is a unique asset. It has a remarkable ability to manage unstructured information in a way that no one else in the market does.  I think it adds a lot of value not only in their space but actually across HP.

125.    On February 22, 2012, during the first quarter earnings conference call, Whitman stated during her discussion of the Company's Services segment that "[t]he Autonomy acquisition

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 29 -

is going well."

126.   During May 2012, HP's stock price began to drop as news leaked out that Autonomy was performing poorly.

127.   On May 23, 2012, HP acknowledged during the second quarter earnings conference call that Autonomy had a very disappointing revenues quarter.  HP announced a management change for Autonomy.

128.   On August 8, 2012, HP announced that it would take an $8 billion goodwill impairment charge within its Services segment (which derived from its EDS acquisition) due to "recent trading values of HP's stock, coupled with market conditions and business trends in the Services segment."  Shortly thereafter, HP filed an 8-K confirming that it was taking the $8 billion charge against third quarter 2012 earnings.  The Services segment's dismal operating performance which was from its EDS acquisition was known or should have been known to Plan fiduciaries.

129.   On August 23, 2012, in response to HP's news, the stock price dropped $1.56 per share, to close at $17.64.

130.   On October 3, 2012, during HP's Security Analyst Meeting, Michael Nefkens, Acting Global Enterprise Leader and Jean-Lacques Charhon, Senior VP and COO of Enterprise Services, gave a powerpoint presentations which showed the collapsing profitability of the Enterprise Service business.   By August 2011, Enterprise Services' operating margin had decreased by 500 basis points, from 10% to 5%, or $6 billion in quarterly revenue.  It further revealed that by October 2012, the operating margin had deteriorated by another 40%, or to 3% on $6 billion in quarterly revenue. HP added that the Services' segment's 2013 revenue would slide by 11% to 13% and that operating margins were expected to be in the range of 0% to 3%.

131.   In response, on October 3, 2012, HP's stock price dropped $2.22 or 13%, on heavy trading volume.

132.   In an October 3, 2012, research report entitled "HP Drops a EPS Bomb for FY2013," Topeka Capital Markets noted:

> Most Negative Impact to FY13 EPS to be Enterprise Services. Yesterday we talked about the services business being our biggest concern. The biggest driver of YoY EPS decline is HP Enterprise Services, that is expected to negatively impact FY13 EPS by $0.29-$0.35 with sales falling 11%-13% YoY. *The operating margin of*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

*the Enterprise Services business is expected to be 0% to 3% in FY13 and well below the 11% delivered in 3QFY12. Keep in mind, HP had at one time expected operating margin to be 16% to 17.5% in this business.* Given a recent CRN article indicating HP has been trying to sell its Enterprise Services business (and since denied by HP), we believe there was some truth to this article given HP's weak FY13 outlook for this business. *Since Enterprise Services was the biggest contributor of profit for HP last quarter . . . this is a long term concern.*

133. In an October 4, 2012 research report entitled "Hewlett Packard: A long turnaround," Credit Suisse commented on the new information defendants decided to disclose about the Services segment and the Enterprise Services business in particular:

Throughout the management presentations, it was made clear that FY13 would be a fix and build year, this is especially the case for HP's Services segment.

\*\*\*

Fixed cost structure and negative leverage. Given the 200K+ employees and high fixed cost structure, *the revenue declines are expected to compress segment operating margin to 0-3% in FY13 from -3% currently and about 10% FY10.* The company noted that a large part of the historic margin declines were due to execution and poor contract management.

134. News outlets also expressed concern about the Company's disclosures regarding the collapse in the profitability of the Enterprise Services business. For example, on October 4, 2012, the *Contra Cost Times*, in an article entitled "HP shares continue to sink as analysts cut price targets," reported:

Analysts expect the company's revenue and margins to falter, increasing uncertainty about its recent strategic decisions which focus on transforming the former industry powerhouse into an enterprise computing corporation that take on IBM and Dell.

*"HP's assumption of turning around the enterprise services business within one-two years looks aggressive, given the significant revenue decline and margin deterioration expected in fiscal 2013,"* BMO Capital Markets analyst Keith Bachman said.

135. Then, on November 20, 2012, the Company disclosed that it had taken an additional $8.8 billion charge related to its acquisition of Autonomy due to serious accounting improprieties. In fact, over $5.0 billion of the write-off was necessary due to the fact that Autonomy's financial results were the product of accounting fraud. The Hewlett-Packard release stated in part:

"HP is extremely disappointed to find that some former members of Autonomy's management team used accounting improprieties, misrepresentations and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

disclosure failures to inflate the underlying financial metrics of the company, prior to Autonomy's acquisition by HP. These efforts appear to have been a willful effort to mislead investors and potential buyers, and severely impacted HP management's ability to fairly value Autonomy at the time of the deal. We remain 100 percent committed to Autonomy and its industry-leading technology."

Additional background:

HP today announced a non-cash impairment charge of $8.8 billion related to Autonomy in the fourth quarter of its 2012 fiscal year. The majority of this impairment charge, more than $5 billion, is linked to serious accounting improprieties, misrepresentation and disclosure failures discovered by an internal investigation by HP and forensic review into Autonomy's accounting practices prior to its acquisition by HP. The balance of the impairment charge is linked to the recent trading value of HP stock and headwinds against anticipated synergies and marketplace performance.

HP launched its internal investigation into these issues after a senior member of Autonomy's leadership team came forward, following the departure of Autonomy founder Mike Lynch, alleging that there had been a series of questionable accounting and business practices at Autonomy prior to he acquisition by HP. This individual provided numerous details about which HP previously had no knowledge or visibility.

HP initiated an intense internal investigation, including a forensic review by PricewaterhouseCoopers of Autonomy's historical financial results, under the oversight of John Schultz, executive vice president and general counsel, HP.

As a result of that investigation, HP now believes that Autonomy was substantially overvalued at the time of its acquisition due to the misstatement of Autonomy's financial performance, including its revenue, core growth rate and gross margins, and the misrepresentation of its business mix.

\*\*\*

This appears to have been a willful effort on behalf of certain former Autonomy employees to inflate the underlying financial metrics of the company in order to mislead investors and potential buyers. These     misrepresentations and lack of disclosure severely impacted HP    management's    ability    to    fairly    value Autonomy at the time of the deal.

136.    Analysts were stunned. As *USA Today* reported on November 20, 2012:

The Autonomy revelation is another blow for HP, which is struggling to reinvent itself as PC and printer sales shrink.

"While the write-down is non-cash, it may call into question the credibility of its board of directors," wrote Shaw Wu, analyst at Sterne Agee & Leach, to a note   to clients.

\*\*\*

Additionally, Whitman has "highlighted she was comfortable and confident in the deal," says Aaron Rakers, analyst at Stifel, Nicolaus. "Given she was on the board when the Autonomy deal was done, I'm not sure if it's a reflection on her, but another ding against the board."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 32 -

The size and scope of the charge is staggering, given that the $8.8 billion financial hit is nearly as large as the $10 billion HP paid for the company. But the company, in a release, said: "We remain 100% committed to Autonomy and its industry-leading technology."

137. On this news, HP stock dropped to close at $11.71, a decline of 12%, on volume of 155 million shares.

138. The true facts, which were known by Plan fiduciaries but concealed from Plan participants during the Class Period, were as follows:

(a) At the time HP acquired Autonomy, the business's operating results and historic growth were the product of accounting improprieties, including the mischaracterization of sales of low-margin hardware as software and the improper recognition of revenue on transactions with Autonomy business partners even where customers did not purchase the products;

(b) At the time HP had agreed in principle to acquire Autonomy, it was looking to unwind the deal in light of the accounting irregularities that plagued Autonomy's financial statements; and

(c) Enterprise Services' operating margin had collapsed from 10% in 2010 to approximately 6% as of April 30, 2011, 4% as of October 31, 2011, and 3% as of April 30, 2012 due to various reasons, including unfavorable revenue mix and underperforming contracts.

(d) There was substantial dissent to the acquisition of Autonomy among at least one large shareholder and other HP officers.

139. With its write-off for the Autonomy acquisition, HP admitted that it overpaid by 79% for the company.

140. Oracle, a competitor which looked at Autonomy, stated in a New York Times on December 1, 2012, that "[w]e looked at Autonomy. After doing the math, we couldn't make it work. We couldn't figure out where the numbers came from. And taking the numbers at face value, even at $6 billion it was overvalued."

141. In sum, in connection with the EDS, Autonomy and Palm acquisitions, HP has written off approximately $18 billion in the last two years.

**H. Defendants Knew Or Should Have Known That HP Stock Was An Imprudent Investment Yet Mislead Plan Participants**

142. During the Class Period, HP's stock price fell from $48.64 to $11.71, or approximately 76%. Defendants knew or should have known during this time that the Company's stock was an imprudent Plan investment due to: (a) HP's enormous management failures; (b) overpayment for the EDS acquisition; (c) deteriorating in the operating margins for Enterprise Software; (d) overpayment for the Palm acquisition; (e) HP's adoption and going "all in" on its

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

1    new core webOS business strategy, then abruptly dropping webOS; (f) HP's publicly touting its

2    commitment to webOS while failing to commit resources to developing products and overstating

3    its progress; (f) HP's overpayment for Autonomy and failure to perform proper due diligence; (g)

4    HP's lack of management credibility and damage to its competitive position from these

5    developments; (h) the fact that as a result of these that HP's stock price was artificially inflated;

6    and (i) the fact that heavy concentration of retirement savings in the Company's stock would

7    inevitably result in significant losses to the Plan, and consequently, to its participants.  Despite

8    actual or constructive knowledge of these facts, Defendants did nothing to protect the heavy

9    investment of the Plan participants' retirement savings into HP stock.

10        143.    Through their high ranking positions with the Company, Defendant Committee

11    members knew or should have known of the existence of these problems.

12        144.    Defendants knew or should have known that, HP's stock price would suffer and

13    devastate the Plan participants' retirement savings when the truth became known. Yet Defendants

14    failed to take any steps to protect the Plan and its participants from foreseeable losses.

15        145.    Defendants also knew or should have known that, due to the false and misleading

16    statements and omissions in SEC filings which were incorporated into the SPD as communications

17    by Plan fiduciaries, Plan participants were unable to properly assess the prudence of investing in

18    HP stock.

19        146.    Defendants failed to conduct an appropriate evaluation or investigation of whether

20    HP stock was a prudent investment for the Plan and, in connection therewith, failed to provide

21    Plan participants with information regarding its internal problems and weaknesses so that they

22    could make informed decisions.

23        147.    In addition, Defendants failed to adequately review the performance of other Plan

24    fiduciaries to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

25        148.    An adequate investigation would have revealed to a reasonable fiduciary that

26    investment by the Plan in HP stock was imprudent during the Class Period.  A prudent fiduciary

27    acting under similar circumstances would have acted to prevent participants against unnecessary

28    losses, and would have made different investment decisions.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

149. Because Defendants knew that HP stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and their participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in HP stock.

150. Defendants had available to them many options for satisfying this duty, including among other things: discontinuing further contributions or investments in HP stock under the Plan either temporarily or until further review; divesting the Plan of HP stock; providing written warnings to Plan participants; consulting with independent fiduciaries regarding appropriate measures; and/or resigning as fiduciaries.

151. Despite the availability of these and other options, Defendants failed to take any action to protect Plan participants from losses resulting from the Plan's investment in HP stock. In fact, Defendants continued to invest and allow the Plan's investment in Company stock even as the problems came to light.

152. Defendants' breaches of their ERISA-mandated fiduciary duties of prudence and loyalty were, by their nature, self-concealing and could not be discovered by the Plan participants. Further, Defendants alleged breaches, including breaches of duties to speak truthfully and provide material information to Plan participants regarding the propriety of HP stock, served to conceal Defendants' primary breach of their duty of prudence. Defendants' misleading, inaccurate and incomplete statements regarding the trades and risks, served to hide from Plan participants: (i) the factual predicate for the breach of fiduciary duty above and reasons alleged herein why HP stock had become imprudent; and (ii) the failure/absence of any investigation into the prudence of investing Plan assets into HP stock.

## VII.   CLASS ACTION ALLEGATIONS

153. Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(a) and (b) on behalf of himself and the following class of persons similarly situated (the "Class"):

> All individuals, excluding Defendants, who participated in the Plan and whose individual accounts transacted in and/or held HP common stock at any time between February 12, 2011, through November 21, 2012.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 35 -

154. Excluded from the Class are Defendants, the officers and directors of the Company, members of the Committees or members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

155. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are over 150,000 members in the proposed Class because, according to HP's Form 5500, there were 157,492 Class members as of December 31, 2011. Record owners and other members of the Class may be identified from records maintained by HP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

156. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    Whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

b.    Whether Defendants breached fiduciary duties owed to the Plan, Plaintiff and members of the Class by failing to act prudently and loyally and solely in the interests of the Plan and the Plan's participants and beneficiaries;

c.    Whether Defendants failed to provide sufficient material disclosure required under ERISA to the Plan participants;

d.    Whether the Defendants violated ERISA; and

e.    To what extent the members of the Class have sustained damages and the proper measure of damages.

157. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages and/or were negatively affected by Defendants' wrongful conduct in violation of ERISA as complained of herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 36 -

158. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA employee pension plans. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

159. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is brought on behalf of the Plan and any prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impeded their ability to protect their interests.

160. Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standard of conduct for Defendants and/or the Nominal Defendant; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to the Class predominate over questions affecting only individual members and this Class action is superior to other available methods for fairly and efficiently adjudicating this action.

## VIII. FIDUCIARY DUTIES UNDER ERISA

### The Statutory Requirements:

161. ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> (1)...[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-- (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

**The Duty of Loyalty:**

162.    ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of ... providing benefits to participants and their beneficiaries...." *See* 29 U.S.C. § 1104(a)(1).

163.    The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

**The Duty of Prudence:**

164.    ERISA also imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ... " *See* 29 U.S.C. § 1104(a)(1)(B).

**The Duty to Inform:**

165.    The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

166.    Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires that fiduciaries furnish a Summary Plan Description ("SPD") to Participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD must apprise Participants of their rights under the Plan. The SPD and all information contained or incorporated therein constitutes a representation in

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 38 -

a fiduciary capacity upon which Participants were entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).

**The Duty to Investigate and Monitor Investment Alternatives:**

167. With respect to a pension plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable option for the Plan.

**The Duty to Monitor Appointed Fiduciaries:**

168. Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed. The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries. In the Plan, the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

(a) possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

(b) are knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's Participants;

(c) are provided with adequate financial resources to do their jobs;

(d) have adequate information to do their jobs of overseeing the Plan's investments with respect to company stock;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

1    (e) have access to outside, impartial advisors when needed;

2    (f) maintain adequate records of the information on which they base their decisions and

3    analysis with respect to Plan's investment options; and

4    (g) report regularly to the monitoring fiduciaries. The monitoring fiduciaries must then

5    review, understand, and approve the conduct of the hands-on fiduciaries.

6    **The Duty Sometimes to Disregard Plan Documents:**

7    169.    A fiduciary may not avoid his fiduciary responsibilities by relying solely on the

8    language of the plan documents. While the basic structure of a plan may be specified, within

9    limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so

10   leads to an imprudent result. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

11   **Co-Fiduciary Liability:**

12   170.    A fiduciary is liable not only for fiduciary breaches within the sphere of his own

13   responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. §

14   1105(a), states, in relevant part, that:

15   In addition to any liability which he may have under any other provision of        this part,

16   a fiduciary with respect to a plan shall be liable for a breach of       fiduciary     responsibility     of

17   another fiduciary with respect to the same plan in     the following circumstances:

18   (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or
     omission of such other fiduciary, knowing such act or omission is a breach; or

19   (2) if, by his failure to comply with section 404(a)(l) in the administration of his
20   specific responsibilities which give rise to his status as a fiduciary, he has enabled
     such other fiduciary to commit a breach; or

21   (3) if he has knowledge of a breach by such other fiduciary, unless he makes
22   reasonable efforts under the circumstances to remedy the breach.

23   **Non-Fiduciary Liability:**

24   171.    Under ERISA non-fiduciaries who knowingly participate in a fiduciary breach may

25   themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

26   **HP's Fiduciary Status**

27   172.    Instead of delegating fiduciary responsibility for the Plan to external service

28   providers, the Company chose to internalize certain vital aspects of this fiduciary function.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 40 -

173. During the Class Period, HP was also a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because, HP through its officers, directors or otherwise, exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets, and is therefore a fiduciary of the Plan. HP also exercised discretionary authority with respect to the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility.

174. By failing to properly discharge their fiduciary duties under ERISA, the employee and officer defendants, including the Committee Defendants, breached fiduciary duties they owed to the Plan, their participants and their beneficiaries. Such individuals were appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment. Accordingly, the actions of such employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

175. In addition, HP acted as a fiduciary in connection with the dissemination of communications to the Plan's Participants. HP made direct representations to Participants relating specifically to the business and financial condition of HP, and the merits of investing the Plan's assets In HP common stock, and those representations were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

176. ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries. "Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe,* 516 U.S. 489, 506 (1996). *See also In re Unisys Corp. Retiree Medical Benefit ERISA Litig.,* 57 F.3d 1255, 1261 (3d Cir. 1995); *Fisher v. Philadelphia Elec. Co.,* 994 F.2d 130, 133 (3d Cir. 1993).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 41 -

1    177.    Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the

2    inaccurate or misleading information so that plan participants will not be injured. *See, e.g.*, *In re*

3    *Unisys Corp.*, 994 F.2d at 133 ("a plan administrator has an affirmative duty to speak when it

4    knows that silence might be harmful"); *see also Bixler v. Central Penn. Teamsters Health &*

5    *Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993); *James v. Pirelli Armstrong Tire Corp.*, 305

6    F.3d 439, 449 (6th Cir. 2002); *Matthews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004).

7    178.    During the Class Period, upon information and belief, the Company and certain

8    other Defendants made direct and indirect communications with the Plan's participants including

9    statements regarding investments in Company stock. These communications included, but were

10   not limited to, SEC filings, annual reports, press releases, and Plan documents (including

11   Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plan/participant holdings of

12   Company stock), which included and/or reiterated these statements.   HP's SEC filings were

13   expressly incorporated into and part of the SPD, and/or a prospectus and/or any applicable SEC

14   Form S-8 registration statements. Defendants also acted as fiduciaries to the extent of this activity.

15   **All of the Defendants Were Co-Fiduciaries**

16   179.    Each defendant is liable for the breaches of fiduciary duty of the other defendants

17   under ERISA § 405, 29 U.S.C. § 1105.

18   **IX.    CLAIMS FOR RELIEF UNDER ERISA**

19   180.    At all relevant times, Defendants were and acted as fiduciaries within the meaning

20   of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

21   181.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil

22   action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

23   182.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty,"

24   provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches

25   any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be

26   personally liable to make good to such plan any losses to the plan resulting from each such breach,

27   and to restore to such plan any profits of such fiduciary which have been made through use of

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 42 -

1   assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as

2   the court may deem appropriate, including removal of such fiduciary.

3       183.    ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in

4   pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest

5   of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants

6   and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances

7   then prevailing that a prudent man acting in a like capacity and familiar with such matters would

8   use in the conduct of an enterprise of a like character and with like aims.

9       184.    These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the

10  duties of loyalty, exclusive purpose and prudence and are the "highest known to the law."

11  *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982). They entail, among other things:

12          a.  The duty to conduct an independent and thorough investigation into, and continually to

13              monitor, the merits of all the investment alternatives of a plan;

14          b.  A duty to avoid conflicts of interest and to resolve them promptly when they occur. A

15              fiduciary must always administer a plan with an "eye single" to the interests of the

16              participants and beneficiaries, regardless of the interests of the fiduciaries themselves

17              or the plan sponsor; and

18          c.  A duty to disclose and inform, which encompasses: (1) a negative duty not to

19              misinform; (2) an affirmative duty to inform when the fiduciary knows or should know

20              that silence might be harmful; and (3) a duty to convey complete and accurate

21              information material to the circumstances of participants and beneficiaries.

22      185.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co- fiduciary,"

23  provides, in pertinent part, that:

24      [I]n addition to any liability which he may have under any other provision of this
        part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
25      responsibility of another fiduciary with respect to the same plan in the following
        circumstances: (A) if he participates knowingly in, or knowingly undertakes to
26      conceal, an act or omission of such other fiduciary, knowing such act or omission is
        a breach; (B) if, by his failure to comply with section 404(a)(l), 29 U.S.C.
27      §1104(a)(1), in the administration of his specific responsibilities which give rise to
        his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

(C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

186.    Plaintiff therefore brings this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

## COUNT I
### Failure To Prudently And Loyally Manage The Plan's Assets
### (Breaches Of Fiduciary Duties In Violation Of ERISA § 404 By All Defendants)

187.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

188.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

189.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendants are liable for losses incurred as a result of such investments being imprudent.

190.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow Plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the Plan, including plan trustees, to do so.

191.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 44 -

1    Plan participants need in order to exercise their rights and interests under the Plan. This duty to

2    inform participants includes an obligation to provide participants and beneficiaries of the Plan

3    with complete and accurate information, and to refrain from providing inaccurate or misleading

4    information, or concealing material information, regarding the Plan's investments and investment

5    options such that the Plan participants can make informed decisions with regard to the prudence of

6    investing in such options made under the Plan.

7          192.   Defendants breached their duties to prudently and loyally manage the Plan's assets.

8    During the Class Period, Defendants knew or should have known that, throughout the Class

9    Period, HP stock had become imprudent investment for Plan participants' retirement savings.

10   Accordingly, Defendants should have taken appropriate responsive action of restricting

11   transactions or new investments by the Plan in HP stock and/or divesting Plan assets from HP

12   stock.

13         193.   Defendants also breached their duties of loyalty and prudence by failing to provide

14   complete and accurate information regarding the Company's true financial condition and/or the

15   Company's concealment of the same.  As such, Plan participants could not appreciate the true

16   risks presented by investments in the Company's stock and therefore, could not make informed

17   decisions regarding their investments.

18         194.   Defendants also had actual or constructive knowledge that the Plan's participants

19   did not have full and complete information about the Company, and thus were unable to make

20   fully informed decisions about whether to retain their holdings in Company stock.  As such,

21   Defendants had the fiduciary obligation to either inform the Plan's participants of the need to take

22   action to protect their financial interests or, if necessary, to liquidate holdings of Company stock

23   on participants' behalf to ensure that they did not suffer a financial loss.

24         195.   As a direct and proximate result of the breaches of fiduciary duties alleged herein,

25   the Plan, and indirectly Plaintiff and the Plan's participants suffered damage to and/or lost a

26   significant portion of their retirement investments. Had Defendants taken the appropriate steps to

27   comply with their fiduciary obligations, the Plan participants would have avoided foreseeable

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

1    losses from transactions in HP stock and/or liquidated some or all of their holdings in Company

2    stock and thereby eliminated, or at least reduced, losses to the Plan.

3        196.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. §

4    1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their

5    breaches of fiduciary duties alleged in this Count.

**COUNT II**

**Failure To Adequately Monitor Other Fiduciaries And**
**Provide Them With Accurate Information**
**(Breaches Of Fiduciary Duties In Violation Of ERISA § 404**
**By HP And The Committee Defendants)**

9        197.    Plaintiff incorporates the allegations contained in the previous paragraphs of this

10    Complaint as if fully set forth herein.

11        198.    At all relevant times, as alleged above, HP and the Committee Defendants were

12    fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

13        199.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of

14    HP and the Committee Defendants included the responsibility to appoint, evaluate, and monitor

15    other fiduciaries, including, without limitation, the Committee and other Company officers,

16    employees and agents to whom fiduciary responsibilities were delegated.

17        200.    The duty to monitor entails both giving information to and reviewing the actions of

18    the monitored fiduciaries. In this case, that means that the monitoring fiduciaries, HP, and the

19    Committee Defendants, had the duty to:

      a.    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

      b.    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

      c.    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

      d.    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

      e.    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investments; and

      f.    Ensure that the monitored fiduciaries report regularly to the monitoring fiduciaries. The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 46 -

1     201.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries

2    are performing their fiduciary obligations, including those with respect to the investment of a

3    plan's assets, and must take prompt and effective action to protect a plan and its participants when

4    they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with

5    complete and accurate information in their possession that they know or reasonably should know

6    that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

7     202.   HP and the Committee Defendants breached their fiduciary monitoring duties by,

8    among other things, (a) failing to ensure that the Committee Defendants completely appreciated

9    the huge risk of significant investment of the Plan's retirement savings of employees in Company

10    stock, an investment that was imprudent and subject to inevitable and significant depreciation; (b)

11    failing to disclose to the Committee Defendants accurate information about the operations of HP

12    which Defendants reasonably should have known the Committee Defendants needed to make

13    sufficiently informed decisions about construing, interpreting, and administering the Plan; (c)

14    failing to ensure that the members of the Committee Defendants were prudently and loyally

15    managing and administering the Plan; and (d) to the extent it was necessary, failing to remove and

16    replace members of the Committee Defendants for their failure to prudently and loyally manage

17    and administer the Plan. HP and the Committee Defendants knew or should have known that as

18    fiduciaries they were responsible for monitoring were continuing to invest the assets of the Plan in

19    HP common stock when it no longer was prudent to do so. Despite this knowledge, HP and the

20    Committee Defendants failed to take action to protect the Plan, and concomitantly the Plan's

21    participants, from the consequences of these fiduciaries' failures.

22     203.   In addition, HP and the Committee Defendants, in connection with their monitoring

23    and oversight duties, were required to disclose to the monitored fiduciaries accurate information

24    about the financial condition of HP that they knew or should have known that these Defendants

25    needed to make sufficiently informed decisions. By remaining silent and continuing to conceal

26    such information from the other fiduciaries, these Defendants breached their monitoring duties

27    under the Plan and ERISA.

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 47 -

204.    HP and the Committee Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

205.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's participants suffered damage to and/or lost a significant portion of their retirement investments.

206.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III
### Breach Of Duty To Avoid Conflicts Of Interest
### (Breaches Of Fiduciary Duties In Violation Of ERISA §§ 404 And 405 By All Defendants)

207.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

208.    At all relevant times, as alleged above, Defendants were fiduciaries within the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

209.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on Plan fiduciaries a duty of loyalty, that is, a duty to discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

210.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia:*

    a.  Failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 48 -

b. Failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served;

c. By otherwise placing the interests of HP and themselves above the interests of the Participants with respect to the Plan's investment in HP Stock, by among other things, keeping the Plan's assets heavily invested in HP common stock when it was imprudent to do so – rather than divesting the Plan's investments in HP common stock – while certain fiduciaries sold their personally held HP common stock at artificially inflated prices. As a result, certain fiduciaries personally profited from those sales while the Plan and its Participants suffered massive losses.

211. As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered substantial losses. If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's participants, suffered substantial damages to or lost a significant portion of its retirement investments.

212. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT IV**
**Co-Fiduciary Liability**
**Breaches O Fiduciary Duties In Violation Of ERISA § 405**
**(Against The Committee And Officer Defendants)**

213. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

214. ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(1) in the administration of his specific

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 49 -

1  responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to

2  commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes

3  reasonable efforts under the circumstances to remedy the breach.

4      215.   As alleged herein, Defendants failed to provide material information to the Plan

5  participants and provided misleading disclosures by the conduct set forth above and, thus,

6  knowledge of such practices is imputed to these Defendants as a matter of law.  In addition,

7  Defendants had knowledge at all relevant times of the factual matters pertaining to the imprudence

8  of HP stock as an investment for the Plan participants' retirement assets.

9      216.   Despite this knowledge, the Defendants named in this Count knowingly

10  participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's transactions

11  and investments in HP stock during the Class Period.  Defendants did so by themselves making

12  imprudent and disloyal decisions regarding the Plan's investment in HP stock in the manner

13  alleged herein in violation of ERISA § 405(a)(1)(A). In addition, these same Defendants failed to

14  undertake any effort to remedy their co-fiduciaries' and one another's failures to prudently and

15  loyally manage the Plan's investment in HP stock, despite knowing such failures were breaches of

16  fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it

17  throughout the Class Period in violation of ERISA § 405 (a)(I)(C).

18      217.   In further violation of ERISA § 405(a)(1)(C), the Defendants named in this Count

19  also knew that inaccurate and incomplete information had been provided to Plan participants, yet,

20  they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures

21  were made to Participants and the market as a whole. Instead, they compounded the problem by

22  further concealing HP's improper practices from Plan participants and the market as a whole.

23      218.   As a direct and proximate result of the breaches of fiduciary duties alleged herein,

24  the Plan, and indirectly Plaintiff and the Plan's participants, suffered substantial damages to and/or

25  lost a significant portion of their retirement investment.

26      219.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. §

27  1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their

28  breaches of fiduciary duties alleged in this Count.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

1

2

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

3       A.      A Determination that the instant action may be maintained as a class action under

4   Rule 23, Federal Rules of Civil Procedure, appointing Plaintiff as class representative, and

5   determining that Plaintiff's counsel satisfies the prerequisites of Rule 23(g);

6       B.      A Declaration that Defendants breached ERISA fiduciary duties owed to the Plan

7   and Participants;

8       C.      A Declaration that Defendants are not entitled to the protection of ERISA §

9   404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

10      D.      An Order compelling Defendants to make good to the Plan all losses to the Plan

11  resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting

12  from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants

13  made through use of the Plan's assets, and to restore to the Plan all profits which the Participants

14  would have made if Defendants had fulfilled their fiduciary obligations;

15      E.      Imposition a Constructive Trust on any amounts by which Defendants were

16  unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

17      F.      An Order enjoining Defendants from any further violations of their ERISA

18  fiduciary obligations;

19      G.      Actual damages in the amount of any losses the Plan suffered, to be allocated

20  among the Participants' individual accounts in proportion to the accounts' losses;

21      H.      An Order that Defendants allocate the Plan's recoveries to the accounts of all

22  Participants who had any portion of their account balances invested in HP common stock

23  maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price

24  of HP common stock;

25      I.      Awarding the Plan and/or Participants rescission and/or money damages (including

26  pre-judgment interest) pursuant to ERISA;

27      J.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

1    K.    An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

2  common fund doctrine; and

3    L.    An Order for equitable restitution and other appropriate equitable monetary relief

4  against Defendants.

5    M.    Such other and further relief the Court deems just and equitable.

6                    **DEMAND FOR JURY TRIAL**

7    Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is

8  permitted by law.

9  DATED:  December 6, 2012          WOLF HALDENSTEIN ADLER
10                                     FREEMAN & HERZ LLP
                                     FRANCIS M. GREGOREK
11                                   BETSY C. MANIFOLD
                                     RACHELE R. RICKERT
12                                   MARISA C. LIVESAY

13
                                     FRANK M. GREGOREK
14

15
                                     750 B Street, Suite 2770
16                                   San Diego, CA 92101
                                     Telephone:  619/239-4599
17                                   Facsimile:  619/234-4599
                                     gregorek@whafh.com
18                                   manifold@whafh.com
                                     rickert@whafh.com
19                                   livesay@whafh.com

20
                                     ZAMANSKY & ASSOCIATES LLC
21                                   Jacob H. Zamansky (JZ 1999)
22                                   Edward H. Glenn, Jr. (EG 0042)
                                     Kevin D. Galbraith (KG 7512)
23                                   50 Broadway, 32nd Floor
                                     New York, NY 10004
24                                   Telephone: (212) 742-1414
25                                   Facsimile: (212) 742-1177
                                     *jake@zamansky.com*
26

27

28  HP:19339.complaint

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
INCOME SECURITY ACT, 29 U.S.C. § 1132 - CASE NO.

- 52 -