1
2
3
4
5
6
7

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE HP ERISA LITIGATION                    No. 3:12- cv-06199-CRB

_____/           **ORDER GRANTING MOTION TO
                                              DISMISS SECOND AMENDED
                                              COMPLAINT**

      Among the extensive litigation spawned by Defendant Hewlett-Packard Company's ("HP") failed acquisition of Autonomy Inc. is a putative ERISA class action alleging that various investment managers and HP executives breached their fiduciary duties by failing to disclose material information about the problems with Autonomy.  On April 2, 2014, this Court granted a motion to dismiss the First Amended Complaint ("FAC") on the grounds that a presumption of prudence applies and that it was not improper for Defendants to take the time to investigate prior to making any disclosures.  See Order re FAC (dkt. 116).

      According to Plaintiffs, two relevant events have occurred since this Court dismissed the FAC that can save their amended complaint.  First, two Financial Times ("FT") articles supposedly brought to light new facts that could remedy the FAC's pleading defects.  And second, the Supreme Court decided Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459 (2014), which abrogated the presumption of prudence and articulated pleading standards for this precise type of claim.  Plaintiffs filed a Second Amended Complaint ("SAC"), which pares down the lengthy claims of its predecessor to a single count that tracks the language of Fifth Third and a Ninth Circuit case that applied it, Harris v. Amgen, 770 F.3d 865 (9th Cir.

2014).  Defendants now move to dismiss the SAC.  Mot. Dismiss (dkt. 125).  Because Plaintiffs have failed to allege facts sufficient to state a claim, the Court hereby GRANTS the motion to dismiss the SAC.

## I.    BACKGROUND

The details of HP's acquisition of Autonomy have been detailed at length in prior orders and are not repeated here.  However, because this suit was filed under The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), background information on HP's retirement plan and the specific ERISA allegations is relevant.

### A.    The Plan

The SAC alleges the following facts.  HP sponsors a 401(k) retirement plan (the "Plan") for its employees.  SAC ¶ 39.  The Plan is governed by the HP Company 401(k) Savings Plan, as amended and restated as of January 1, 2007, and January 1, 2012 (the "Plan Document").  Id. ¶ 49.  The Plan Document identifies and names two fiduciaries for the Plan: the Plan Committee for operation and administration of the Plan, and the Investment Review Committee ("IRC") for control and management of the assets of the Plan.  Id. ¶¶ 46, 49.  Each of the named individual defendants was a member of the IRC while employed by HP during the class period.  Id. ¶¶ 32–36.

HP is the Plan's nominal sponsor.  Id. ¶ 26.  However, HP appointed State Street Bank and Trust Company to serve as the investment manager for the HP Common Stock Fund.  Id. ¶¶ 37–38.  State Street was the "investment manager and independent fiduciary" with authority, discretion, and control regarding the HP Common Stock Fund under the Plan.  Id. ¶¶ 38, 53.  The Plan Document limits the level of discretion that the Plan Committee and the IRC have with respect to the management of the HP Common Stock Fund.  Id. ¶ 50.

The Plan is a contribution benefit plan open to all HP employees.  Id. ¶ 39.  Plan participants have the option of making voluntary contributions to their accounts which HP matches dollar-for-dollar up to the first four percent of a participant's eligible compensation.  Id. ¶ 40.  Plan participants freely decide how to allocate and reallocate their contributions, and HP's matching contributions, in a variety of offerings which the Plan Document divides

2

United States District Court
For the Northern District of California

1 | into two categories: Investment Funds[1] and the dedicated HP Common Stock Fund (the "HP

2 | Fund").  Id. ¶ 41.

3 |      This lawsuit focuses on the HP Fund.  The HP Fund is an employee stock ownership

4 | plan ("ESOP") which, under ERISA, is required to invest exclusively in HP stock.[2]  See SAC

5 | ¶ 65.  As an ESOP, the HP Fund, consistent with the intent of Congress in enacting ERISA,

6 | provides a simple way for HP employees to invest directly in the company for which they

7 | work.  See Quan v. Computer Sciences Corp., 623 F.3d 870, 879  n.7 (9th Cir. 2010) (noting

8 | that Congress intended for ESOPs "to reward and motivate employees by making them

9 | stakeholders in the success of the companies that employ them"), abrogated on other grounds

10 | by Fifth Third, 134 S. Ct. 2459.  Though ERISA requires that this ESOP invest exclusively

11 | in HP stock, the Plan Document gives broad discretion to the Trustee regarding the "time,

12 | price, amount and manner of purchase of Stock for the Stock Fund."  Conway Decl., Ex. A at

13 | § 9(b) (401(k) Savings Plan, dkt. 82-1).[3]

14 | **B.    The Parties**

15 |      Plaintiffs are former HP employees and participants in HP's 401(k) Stock Fund.  SAC

16 | ¶¶ 20–22.  Plaintiffs purchased HP stock through the Plan during the Class Period.  Id.

17 | Plaintiffs allege that they suffered losses from purchasing and holding HP stock, rather than

18 | purchasing or diversifying into other investment options under the Plan.  Id. ¶¶ 20–22, 70.

19 |      The SAC alleges that non-party State Street Bank and Trust company ("State Street")

20 | is a trust company independent from HP that HP appointed to serve as the investment

21 | manager for the HP Fund during the class period.  Id. ¶¶ 37–38.  Plaintiffs allege that State

22 | Street acted as a co-fiduciary and independent investment manager with authority, discretion

---

[1] In 2012, the IRC permitted investment in 27 funds in addition to the HP Stock Fund, including money market funds, bond funds, and mutual funds offered through Fidelity Investments.  Conway Decl., Ex. C at 25–27.

[2] The parties agree that to qualify as an ESOP the HP Stock Fund is required to invest exclusively in HP Stock.  Compare Mot. to Dismiss FAC (dkt. 81) at 2, with Opp'n to Mot. to Dismiss FAC (dkt. 98) at 7.  They dispute whether the Plan required that the HP Stock Fund be available as an investment option.

[3] The Court granted the unopposed motion to take judicial notice of these documents in its Order granting the motion to dismiss the FAC.  Order at 1.

United States District Court
For the Northern District of California

and control regarding the offering, and continued offering, of the HP Fund under the Plan—subject to the oversight and supervision of the IRC.  Id. ¶ 38.  State Street "ha[d] no discretion as to whether to continue the availability of [the HP Stock] Fund as an investment option."  Conway Decl., Ex. G at 1 (dkt. 82-7).

Defendant Catherine A. Lesjak was HP's Chief Financial Officer during the Class Period and the Chair of the IRC.  SAC ¶ 32.  Defendant John N. McMullen was HP's Treasurer during the Class Period.  Id. ¶ 33.  Defendant James T. Murrin was HP's Controller from the start of the Class Period until March 2012.  Id. ¶ 34.  Defendant Mark A. Levine was HP's Controller from March 2012 through the end of the Class Period.  Id. ¶ 35.  Defendants Lesjak, McMullen, Murrin, and Levine were named fiduciaries under the Plan.  Id.  ¶¶ 32–38.  Defendants McMullen, Murrin, and Levine were also members of the Plan Committee.  Id. ¶ 36.

### C.      ERISA Allegations

The SAC alleges, in essence, that Defendants violated their fiduciary duties under ERISA by engaging in an illegal scheme to conceal material facts about Autonomy's improper accounting practices in that they failed to freeze new investments in the HP Stock Fund and/or failed to disclose complete and accurate information to Plan participants despite knowing that HP stock had become artificially inflated in value.  See, e.g., SAC ¶ 135.  The SAC alleges that Defendants did so despite "ha[ving] the authority and discretion to cease the continued offering of the HP Common Stock Fund, to restrict or suspend investments or to eliminate or sell out."  Id. ¶ 61.

The Autonomy acquisition officially closed on October 3, 2011, at a purchase price of $11.1 billion.  Id. ¶¶ 73–74.  At that point, HP began to integrate Autonomy, and the SAC alleges that "[a]lmost immediately, HP's senior management became aware of HP's improper accounting practices.  Id. ¶¶ 75–76.  But the facts alleged in support of any such discovery are thin. The SAC focused on two of Autonomy's improper accounting practices that allegedly came to HP's attention immediately after the acquisition.  First, one of Autonomy's frauds was later determined to involve the use of loss-making hardware sales to

make up for revenue shortfalls in software sales.  Id. ¶ 77.  The SAC alleges that a February 17, 2014, FT article states that several emails show that HP executives, perhaps including Meg Whitman, "were included in communications that referred to hardware sales" by Autonomy.  Id. ¶ 77–78.  And, Deloitte work papers that were available to HP to review once the acquisition closed stated that "hardware accounted for 9 per cent of Autonomy's sales in the previous six months."  Id. ¶ 79.  As to this point, the SAC concludes that "it is reasonable to infer that the senior-most financial officers at HP . . . would have been aware of these facts [on October 3, 2011]" and would have understood the implications of this information with respect the accuracy of Autonomy's accounting practices."  Id. ¶ 80.

Second, the SAC alleges that HP was aware soon after the acquisition closed that Autonomy was booking software sales to retailers.  Id. ¶ 81.  The SAC alleges that this practice was acceptable under international accounting rules but ran afoul of United States accounting rules, and that the FT article states this was known to HP senior management at the time the acquisition closed.  Id. ¶ 81.  Again, the SAC concludes that "it is reasonable to infer" that senior management would have known about "a major discrepancy in accounting practice" and "would have understood the implications of this information."  Id. ¶ 81.

The SAC goes on to allege that "[r]ather than come clean about what it had learned about Autonomy's accounting practices . . . HP attempted to 'unwind' these accounting improprieties in secret."  Id. ¶ 84.  After the acquisition closed, HP undertook a series of studies of Autonomy's software sales, including one by HP Worldwide Director of Software Revenue Recognition Paul Curtis, one by HP's auditor E&Y in connection with HP's year-end audit, and one by E&Y and KPMG in order to optimize Autonomy's revenue procedures for United States accounting standards.  Id. ¶ 86.  The SAC concludes that it is "reasonable to infer that senior-level financial and accounting executives" would have been appraised of what the investigations revealed and "would have understood what it meant."  Id. ¶ 87.  HP's deteriorating license revenue growth and software operating margin after the Autonomy acquisition allegedly indicate that "HP had begun a gradual winddown of Autonomy's improper accounting practices."  Id. ¶¶ 88–91.

United States District Court
For the Northern District of California

1      HP's quiet efforts to remedy Autonomy's accounting practices were allegedly

2 "upended" by the whistleblower allegations that emerged in May 2012. Id. ¶ 93.  HP then

3 initiated an investigation by Pricewaterhouse Coopers ("PwC")—but this was "little more

4 than theater . . . considering that the accounting improprieties revealed to HP by the

5 whistleblower were already well known to it," as evidenced by the FT's disclosure that "HP

6 executives routinely discussed Autonomy hardware sales months before the supposed

7 whistleblower came forward." Id. ¶¶ 93–94.  Senior Autonomy executive Michael Lynch

8 left HP soon after the whistleblower allegations, and later insisted that Autonomy was "fully

9 open and transparent with its auditors" all along. Id. ¶¶ 96–98.

10      In the following months, while the PwC investigation continued, "the Autonomy

11 business at HP reported worse and worse results," including an announcement on August 8,

12 2013, that HP would take an $8 billion goodwill impairment charge within its Services

13 segment. Id. ¶ 100–103.  On November 20, 2012, six months after the whistleblower came

14 forward, HP announced it would write down 85% of Autonomy's purchase price, over $5

15 billion of which was due to Autonomy's serious accounting improprieties and fraud. Id.

16 ¶ 104.  HP's stock declined 12% on this news. Id. ¶ 106.  Specifically, HP's stock price fell

17 from $13.30 to $11.71, only to bounce back within 9 trading days and not close below that

18 level since—indeed, HP's stock price has nearly tripled since November 19, 2012, the day

19 before HP disclosed an Autonomy fraud.  Mot. Dismiss at 16.

20      The SAC alleges that on these facts, Defendants breached their fiduciary duties by

21 taking no corrective "action to protect the Plan or its participants from foreseeable harm and

22 damage" despite knowing that "HP's stock had become artificially overvalued and far riskier

23 than Plan participants could have known" and would "suffer from a substantial correction"

24 when Autonomy's accounting practices came to light.  SAC ¶¶ 111–12.  Specifically, the

25 SAC alleges that "Plan Fiduciaries could have provided new investment guidelines to State

26 Street halting all new purchases of HP stock" and could have made public disclosures about

27 HP's knowledge of Autonomy's accounting improprieties. Id. ¶ 113.  The SAC concludes

28 that no fiduciary in Defendants' positions could reasonably have concluded that "doing

1  nothing would be less harmful to Plan participants than taking either or both" of the

2  suggested actions because "a stock price always falls when news of a fraud is revealed." Id.

3  ¶ 114.

4       **D.      This Court's Ruling in the Related Securities Litigation**

5       On November 26, 2013, this Court ruled on motions to dismiss in a related securities

6  litigation case based on the same underlying facts. In re HP Securities Litigation, No. 12-

7  5980 (dkt. 201) ("Securities Order"). This Securities Order granted in part and denied in part

8  the motions to dismiss. Specifically, the Court rejected all claims involving statements made

9  prior to May 23, 2012, and all claims regarding statements made by Lesjak. Id. However,

10 the Court assumed, without deciding, the falsity of the statements at issue because its "ruling

11 hinge[d] primarily on the issue of scienter." Id. at 8. The parties have since reached a

12 settlement in that action, which awaits approval by this Court. See Mot. Settlement (No. 12-

13 5980, dkt. 257).

14 **II.     LEGAL STANDARD**

15      Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed

16 for failure to state a claim upon which relief may be granted. Dismissal may be based on

17 either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

18 cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

19 1990). For purposes of evaluating a motion to dismiss, a Court "must presume all factual

20 allegations of the complaint to be true and draw all reasonable inferences in favor of the

21 nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). A

22 complaint must plead "enough facts to state a claim to relief that is plausible on its face."

23 Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550

24 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that

25 allows the court to draw the reasonable inference that the defendant is liable for the

26 misconduct alleged." Id.

27      The claims for breach of fiduciary duty that Plaintiffs assert are governed by ERISA,

28 which requires fiduciaries of retirement plans to "discharge [their] duties with respect to a

*United States District Court*
*For the Northern District of California*

7

United States District Court
For the Northern District of California

plan solely in the interest of the participants and beneficiaries" and to do so "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1).

Claims for fraud must meet the pleading standard of Federal Rule of Civil Procedure 9(b), which requires a party "alleging fraud or mistake [to] state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) "requires an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted).

## III.    DISCUSSION

The instant motion to dismiss calls this Court to determine how, if at all, the Court's previous Order dismissing the FAC has been affected by new facts from the FT articles and by new law from Fifth Third and Harris. Looking at the legal sufficiency of the allegations in toto in light of the aforementioned case law and factual developments, the Court GRANTS the motion to dismiss the SAC. The "new facts" from the FT articles show nothing more than that HP knew around the time of the acquisition that Autonomy sold hardware and used value-added resellers—not that Autonomy engaged in fraud in its accounting or use of these practices. At most, the FT articles insinuate that there was no Autonomy fraud at all—rather, that HP was mistaken in its valuation of Autonomy and botched the integration, and in hindsight seeks to shift the blame for its own incompetence. Whatever the import of that scenario for a different lawsuit, it provides no support for—indeed, undermines—the claims at issue in this ERISA suit that HP concealed a fraud from investors. Ultimately, the SAC fails to state a claim that HP was imprudent under "the circumstances prevailing at the time" HP acted, and accordingly must be dismissed. See Fifth Third, 134 S. Ct. at 2471 (quoting § 1104(a)(1)(B) (alternations omitted).

### A.    The Court's Order Dismissing the FAC

In dismissing the FAC, this Court made several determinations relevant to the instant

United States District Court
For the Northern District of California

1    motion.  First, the Court held that the <u>Moench</u> presumption of prudence applies, and

2    therefore, "to overcome the presumption of prudent investment, plaintiffs must . . . make

3    allegations that clearly implicate the company's viability as an ongoing concern or show a

4    precipitous decline in the employer's stock . . . combined with evidence that the company is

5    on the brink of collapse or is undergoing serious mismanagement.  Order re FAC at 9 (citing

6    <u>Moench v. Robertson</u>, 62 F.3d 553, 571 (3d. Cir. 1995)).  Plaintiffs having made no such

7    allegations, the Court granted the motion to dismiss the prudence claims.  <u>Id.</u>

8        As to the disclosure claims, the Court noted that all of defendants' statements and

9    omissions were made either before Whistleblower No. 4 came forward, or while the

10   investigation into Whistleblower No. 4's allegations was ongoing.  Order re FAC at 9.  The

11   Court held that the reasoning of its Securities Order in the parallel action was persuasive

12   here, in that it was "both proper and lawful" for HP to take the time necessary to investigate

13   the allegations because "[m]anagers cannot tell lies but are entitled to investigate for a

14   reasonable time, until they have a full story to reveal," and defendants were under "no

15   obligation to prematurely report allegations, even if well founded[,] nor would Defendants

16   have been able to accurately determine the true amount of the required write-down absent a

17   thorough investigation."  Order re FAC at 10 (quoting Securities Order, 12-5980 (dkt.201) at

18   17).  The Court also noted that "[i]f Defendants had been able to terminate or suspend the HP

19   Stock Fund as a result of concerns over Autonomy, the impact of such a termination or

20   suspension on the price of HP stock, including that already owned by the HP Stock Fund,

21   likely would have been dire."  Order re FAC at 10–11.

22       **B.    New Factual Allegations in the SAC**

23       Plaintiffs identify SAC ¶¶ 3, 77–79, 81, and 94–95 as containing the "new facts"

24   regarding Defendants' alleged discovery of accounting improprieties at Autonomy.  Opp.

25   (dkt. 131) at 22.  The only "new facts" alleged in each of these paragraphs relate to the two

26   FT articles about the Autonomy acquisition.  To the extent the SAC takes lines out of

27   context, the Court is entitled to look to the articles themselves to determine the plausibility of

28   the allegations.  <u>See</u> <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir.),

United States District Court
For the Northern District of California

1   amended on other grounds by 275 F.3d 1187 (9th Cir. 2001).  The articles state that "HP was

2   put on notice about the existence of hardware sales at Autonomy in the seven months

3   between when it closed the deal and May 2012, when it says its attention was first drawn to

4   the transactions by a whistleblower."  Wolinsky Decl. (dkt. 126) Ex. 1, at 2 (FT Feb. 17,

5   2014).  The article adds that "large sales of hardware were routinely acknowledged in

6   Autonomy audit reports" that "were available to HP management after the acquisition," and

7   gives examples of emails between November 2011 and May 2012 that referred to hardware

8   sales.

9       But the Court does not understand Plaintiffs' allegation to be that it was secret or

10  improper for a software company to sell hardware bundles.  Rather, as the FT article also

11  notes, HP has stated that it knew that "a portion of Autonomy's revenues were related to

12  hardware sales," but "knew nothing of the accounting improprieties, misrepresentations and

13  disclosure failures related to such sales" until Whistleblower No. 4 came forward.  Id. at 2.

14  Along this same vein, the SAC makes much of the fact that the audit reports disclosed early

15  on that "hardware accounted for 9 per cent of Autonomy's sales in the previous six

16  months—only slightly less than the 10-15 per cent HP later claimed was an indication of the

17  scale of the alleged misrepresentation."  But on the plain text of the article, the statement is

18  only that 9 or 10 or 15 percent of Autonomy's revenue being fraudulent is a fraud on a

19  substantial "scale"—in other words, a relatively large fraud.  But nothing indicates

20  knowledge of the fraud, as opposed to knowledge of the source of revenue, in an audit report

21  that merely says that 9% of sales came from hardware.

22      A similar pattern plays out with respect to the FT's other alleged "revelation": that HP

23  knew soon after the acquisition that Autonomy was recording sales to resellers in a way that

24  was permitted by international accounting rules, and that HP was making adjustments to

25  Autonomy's approach to reflect US accounting rules.  Id. at 3.  But again, no one alleges that

26  sales to resellers in and of themselves are fraudulent.  In other words, knowing about the

27  sales does not indicate that HP knew about the fraud, and the FT articles provides nothing

28  more.

1    In other words, there appears to be a disconnect between the SAC's allegations and

2    the substance of the articles, even reading them in the light most favorable to the Plaintiffs.

3    The articles themselves doubt that Autonomy defrauded HP at all, and suggest instead that

4    HP merely made a bad investment—"overpaid for Autonomy, then botched its

5    integration"—and now seeks to shift the blame.  Wolinsky Decl. Ex. 2, at 1 (FT Feb. 17,

6    2014).  Thus, the FT's evidence is meant to show that HP knew early on that Autonomy sold

7    hardware and made sales to resellers, but that "compelling corroboration has yet to emerge"

8    that any of those sales were fraudulent.  Id.  Both in light of this ultimate conclusion and

9    under a careful reading of the articles' facts, the FT—and therefore the SAC's "new

10   evidence" to overcome this Court's earlier holding—adds little or nothing to the facial

11   plausibility of Plaintiffs' theory as a matter of pleading.

12        **C.    Fifth Third and Harris**

13        The Supreme Court decided Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459

14   (2014), shortly after this Court issued its Order granting the motion to dismiss the FAC—and

15   thus that Order's reliance on the Moench presumption of prudence became short-lived.  See

16   Moench, 62 F.3d at 571; Quan, 623 F.3d at 882.  In Fifth Third, the Supreme Court held that

17   an ESOP fiduciary's decision to buy or hold the employer's stock is subject to the same duty

18   of prudence that applies to ERISA fiduciaries in general,[4] except that the fiduciary need not

19   diversify the fund's assets.  134 S. Ct. at 2467.  In so doing, the Court abrogated the Moench

20   presumption of prudence that had previously set a higher standard of pleading for this type of

21   claim.  Id.

22        The allegations at issue in Fifth Third, like those here, claimed that "nonpublic

23   information (which petitioners knew because they were Fifth Third insiders) indicated that

24   Fifth Third officers had deceived the market by making material misstatements about the

25   company's financial prospects," which artificially inflated the price of Fifth Third stock.  Id.

26   at 2464.  The Court articulated the following pleading requirement for this type of claim:

27

28        _____

        [4] That standard asks what a prudent person would do "'in the conduct of an enterprise of a like
   character and with like aims.'" 134 S. Ct. at 2463 (quoting § 1104(a)(1)(B)).

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> To state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund that to help it.

Id. at 2472.  "[T]hree points inform the requisite analysis."  Id.  First, "the duty of prudence . . . does not require a fiduciary to break the law," including insider trading laws, so "ERISA's duty of prudence cannot require an ESOP fiduciary" to sell the fund's stock on the basis of inside information.  Id. at 2472–73.  The second point arises where, as here, "a complaint faults fiduciaries for failing to decide, on the basis of the inside information, to refrain from making additional stock purchases or for failing to disclose that information to the public so the stock would no longer be overvalued."  See id. at 2473.  In these circumstances, the "courts should consider the extent to which an ERISA-based obligation either to refrain on the basis of inside information from making a planned trade or to disclose inside information to the public could conflict with the complex insider trading and corporate disclosure requirements imposed by the federal securities laws or with the objectives of those laws."  Id. at 2473 (citing 29 U.S.C. § 1144(d) ("Nothing in this subchapter [which includes § 1104] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law.").

The SAC does not allege facts sufficient to plead the two main elements under Fifth Third.  First, "a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws."  134 S. Ct. at 2472.  The alternative actions that the SAC alleges are "restricting transactions or new investments by the Plan in HP Stock and/or" publicly disclosing its "illegal scheme to hide or conceal material adverse facts about Autonomy's improper accounting practices."  SAC ¶ 135.  But it is inconsistent with, or at least "alters," the disclosure regime of the securities laws to require HP to disclose in real time any suspicions or allegations about Autonomy that are yet uninvestigated.  See, e.g., In re Boston Scientific Corp. Sec. Litig., 686 F.3d 21, 27–28 (1st Cir. 2012) (Securities laws do not require a company "to disclose immediately all information that might conceivably affect stock prices"; such a rule "would be extreme" and

"could easily disadvantage shareholders in numerous ways . . . ."); <u>Matrixx Initiatives, Inc. v.</u> <u>Siracusano</u>, 131 S. Ct. 1309, 1321 (2011) ("[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information" that a company possesses). This Court already held that under these circumstances, it was proper for HP to investigate Whistleblower No. 4's allegations rather than spooking the market with half-baked allegations. <u>Fifth Third</u> directs this Court to consider the extent to which a disclosure "could conflict with the complex insider trading and corporate disclosure requirements . . . or with the objectives of those laws," 134 S. Ct. at 2473, and no laws envision the real-time disclosure that Plaintiffs demand here.

Second, the SAC fails to allege facts that make it plausible that "a prudent fiduciary in the same circumstances would not have viewed" pre-investigation disclosure to be "more likely to harm the fund that to help it"—in other words, "that a prudent fiduciary in the defendant[s'] position could not have concluded that . . . publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." 134 S. Ct. at 2472, 2473. HP was entitled to investigate—indeed, there is little doubt that HP would have been subject to claims of imprudence had it disclosed uninvestigated allegations. <u>See, e.g.</u>, <u>Higginbotham v. Baxter Int'l, Inc.</u>, 495 F.3d 753, 760–61 ("Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention."). As this Court already explained, the market impact of freezing the HP Fund as a result of concerns over Autonomy "likely would have been dire," and a prudent manager could have—likely, would have, under the circumstances here—waited to investigate the existence and extent of a third-party fraud before disclosing it to the market. And no alleged facts establish that the six-month duration of the PwC investigation was itself imprudent.

The only Ninth Circuit case to have yet applied <u>Fifth Third</u> in detail is <u>Harris v.</u>

Amgen, No. 10-56014, 2015 WL 3372373, -- F. 3d --, (9th Cir. May 26, 2015).[5]  There, the

Ninth Circuit reversed a district court's dismissal of an ERISA complaint that alleged, like

the complaint we presently review, that defendants violated their duty of prudence by

continuing to provide the Amgen Common Stock Fund as an investment alternative when

they knew or should have known that the stock was being sold at an artificially inflated price.

Id. at *26, *44.  The Ninth Circuit found it plausible under the circumstances of that case that

defendants could have removed the Amgen Stock Fund from the list of investment options

without causing undue harm to plan participants because "any reduction in the stock price

would anticipate (and only partially) the inevitable result of Amgen's eventual compliance

with the federal securities laws," and because disclosure at the point at which fiduciaries

"knew or should have known that material information was being withheld from the public"

could prevent plan participants from making "continued investments in the fund at

increasingly inflated prices." Id. at *46–47.

　　　But Harris v. Amgen is fundamentally different from the instant case.  In Amgen, the

alleged fraud was committed by Amgen officials themselves.  In other words, the facts

involved an alleged fraud perpetrated by Amgen itself in which Amgen made false public

statements to hide negative results of clinical trials of its marquee drug.  The Ninth Circuit

explained that the Amgen fiduciaries "knew or should have known that the Amgen Common

Stock Fund was purchasing stock at an artificially inflated price due to material

misrepresentations and omissions by company officers, . . . but they nevertheless continued

to allow plan participants to invest in the Fund." Id. at *44.  The court saw no tension

between ERISA and the reporting requirements imposed by securities laws because the

material misrepresentations were themselves violations of securities laws—in other words,

"the central problem in th[at] case is that Amgen officials, many of whom [we]re defendants

[t]here, made material representations and omissions in violation of the federal securities

laws"—and so both securities laws and the fiduciary obligations of ERISA "simultaneously"

---

[5]  This opinion amended and replaced a prior opinion, Harris v. Amgen, 770 F.3d 865 (9th Cir. 2014).

United States District Court
For the Northern District of California

1  demanded that defendants publicly expose their own fraud.  <u>Id.</u> at 48.  "Any problem," then,

2  "created by allowing plan participants to invest in the Fund as it purchased Amgen stock at

3  artificially inflated prices is a problem of the defendants' own making."  <u>Id.</u> at 47.

4     But of course a company knows (or may be deemed to have known under appropriate

5  circumstances) that the company itself is perpetuating a fraud and cannot conceal its own

6  fraud from the market.  Thus, when the Ninth Circuit stated that Amgen officials knew or

7  should have known that the stock was artificially inflated and had a duty to report this to the

8  market at that moment—a duty imposed by both ERISA and the securities laws—the court is

9  simply saying a fiduciary is not entitled to conceal his own fraud.  <u>See id.</u>

10    <u>Amgen</u>, therefore, is missing the entire layer of a third-party fraud—here,

11  Autonomy's—that HP had to have understood in order to conceal.  This brings us full-circle

12  to the entitlement to investigate that is so pressing here but absent from <u>Amgen</u>: even

13  assuming, as the Ninth Circuit did, that the decline in stock price triggered by disclosure

14  might be no more than that by which the stock was artificially inflated, <u>id.</u> at *46–47, this is

15  not so if a premature disclosure sparks market fears that thorough investigation later shows to

16  be unfounded.  In that event, the decline could be far worse than what was actually

17  warranted, and a prudent fiduciary would not so act.  <u>Amgen</u> itself states that "the proper

18  question is . . . whether the fiduciary used 'appropriate methods' to investigate the merits of

19  the transaction."  <u>Id.</u> at *42 (quoting <u>Quan</u>, 623 F.3d at 879).  Here, HP conducted three

20  investigations in the process of integrating Autonomy and then commissioned the PwC

21  investigation of the fraud allegations after Whistleblower No. 4 came forward.  HP should

22  have, and was entitled to, investigate, and none of the allegations in the SAC plausibly plead

23  otherwise.  "Because the content of the duty of prudence turns on "the circumstances . . .

24  prevailing" at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will

25  necessarily be context specific."  134 S. Ct. at 2471.  The different context of this case than

26  the one at issue in <u>Amgen</u> justifies a different result.

27  **IV.   CONCLUSION**

28    For the foregoing reasons, the Court GRANTS the motion to dismiss.  This is already

the Second Amended Complaint, and the Court sees no compelling representation that changed facts or circumstances warrant another amendment.  Rather, it is clear by this point in the extensive life of this case that the SAC's shortcomings are inherent legal ones, not curable omissions of facts or inartful pleading that could be saved by amendment.  See Chang v. Chen, 80 F.3d 1293, 1296 (9th Cir. 1996).  Plaintiffs' "repeated failure to cure deficiencies by amendments previously allowed" is a symptom of the SAC's deeper malaise—that the actions it sets forth are simply not actionable under Fifth Third and ERISA, for the reasons explained above.  See Foman v. Davis, 371 U.S. 178, 182 (1962).  Accordingly, any further amendment would be futile, and the Court hereby dismisses WITHOUT LEAVE TO AMEND.

   **IT IS SO ORDERED.**

Dated: June 15, 2015

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

16